FIREMAN'S FUND INSURANCE COM-
PANIES, Associated Indemnity Compa-
ny and National Surety Company, as
subrogees of Allis–Chalmers Corpora-
tion, Allis–Chalmers Reorganization
Trust, and Allis–Chalmers Product Lia-
bility Trust, Plaintiffs,

v.

SIEMENS ENERGY & AUTOMATION,
INC., Defendant.

No. 93 Civ. 4669 (LAK).

United States District Court,
S.D. New York.

Dec. 24, 1996.

See also: 1994 WL 376011.

Richard Granofsky, Lester Schwab Katz & Dwyer, Millburn, NJ, for Plaintiffs.

James Nespole, Evan Kornrich, Fulbright & Jaworski, L.L.P., New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiffs here seek to recover costs incurred by them in defending and settling two products liability cases brought against Allis–Chalmers Corporation ("Allis"). They claim that defendant Siemens Energy Group & Automation, Inc. ("Siemens") is obliged by contract to indemnify Allis and certain related entities for any such liability and, in consequence, that they are entitled to recover as subrogees. Jurisdiction is based on diversity of citizenship.[1]

Following the denial of cross-motions for summary judgment, the parties agreed to trial on a stipulated record and as to the damages to be awarded in the event plaintiffs prevail. (Order for Trial to the Court, Aug. 26, 1996) The record includes extensive deposition testimony, some of it videotaped.[2] This is the Court's decision after trial and includes its findings of fact and conclusions of law. FED.R.CIV.P. 52(a).

### I

### The Genesis of the Dispute

#### Siemens' Acquisition of Allis' Electrical Products Group

---

1. Defendant is a citizen of Delaware and Georgia. Plaintiffs all are citizens of California or Illinois.

2. It includes as well trial briefs totaling 175 pages, which effectively incorporate summary judgment briefs totaling 121 pages. With due respect to counsel, the 296 pages crossed the line that distinguishes a helpful ray of light from a blinding glare.

On January 1, 1978, Siemens–Allis, Inc.[3] purchased all of the assets of Allis–Chalmers Electrical Products Group (the "EPG") from Allis. As is typical in such transactions, the Transfer Agreement between the parties specifically addressed post-closing responsibility for products liability claims arising out of products manufactured by EPG. It provided, in relevant part, that Siemens would:

> "assume and agree to discharge, and indemnify and hold harmless [Allis] from, any and all claims, losses, expenses or liabilities of any kind or nature now in existence or hereafter arising from or relating to the conduct of the [EPG] by [Allis] including but not limited to ... those relating to products, including parts, manufactured or sold, or services of the kind currently provided by the [EPG], including any predecessor models or versions of such products regardless of whether the date of manufacture, sale or service is before or after the Closing Date, including any pending uninsured litigation in which a defect in such a product is asserted ..." (Granofsky Aff.Ex. 3 (the "Transfer Agreement"), Art. II, § 2.01.C)

Allis cross-indemnified Siemens with respect to any claims, *inter alia*, with respect to products of Allis' discontinued transformer operations. (*Id.*)

Following the sale, plaintiffs ("FFIC")[4] issued various commercial general liability ("CGL") insurance policies to Allis. The two product liability cases at issue here, the *Griffith* and *Shook* suits, were commenced against Allis in 1984 and April or May 1987, respectively, and were within the coverage of plaintiffs' policies. Nevertheless, as contemplated by the Transfer Agreement, Siemens hired defense counsel and initially defended these among other cases. (Feuss Dep. I, 27–28)

## The Allis Bankruptcy

On June 29, 1987, Allis filed for bankruptcy protection under Chapter 11. This led to protracted proceedings between Allis and FFIC and between Allis and Siemens.

### The Allis–FFIC Settlement

The policies pursuant to which FFIC insured Allis prior to and at the time of the bankruptcy filing were retrospective premium policies pursuant to which Allis was obliged to reimburse FFIC for defense and indemnification costs at the conclusion of each policy period.[5] (Braza Dep. 144–45; Granofsky Aff.Ex. 6, at 14) Disputes concerning FFIC's claims for reimbursement from the debtor and other matters led to the commencement of litigation in the Bankruptcy Court between FFIC and Allis. Among other things, FFIC sought either to avoid the insurance obligations under the CGL policies or force Allis to assume the retrospective premium agreements in bankruptcy. (Braza Dep. 145–46) Allis' creditors, however, were unwilling to agree to the assumption of the retrospective premium obligations. (*Id.* 146) In June 1988, Allis and FFIC reached a settlement that ultimately was signed by the parties and approved by the Bankruptcy Court in October 1988. (*Id.* 146–47; Granofsky Aff.Exs. 7–8)

Under the terms of the settlement, the FFIC insurance policies remained in place but were converted from retrospective premium to more conventional insurance, with the agreed amount of the pre-petition premium treated as an allowed claim in the bankruptcy. (Braza Dep. 45–46, 153–54) In reaching the settlement, the parties negotiated a fixed premium based upon their respective projections of what the costs of defense and indemnification for the relevant exposures would be. (*Id.* 46–47) The *Shook* and *Griffith* cases, as well as the others that were being defended by Siemens, were not consid-

---

**3.** At the time, Siemens–Allis, Inc. was owned jointly by another Siemens entity and Allis. (Feuss Dep., Jan. 22, 1996 [the January 22, 1996 and February 1, 1996 sessions of Feuss' deposition hereinafter are referred to as "Feuss Dep. I"], 34–35) A Siemens entity purchased the Allis interest in January 1986 and changed the company name to Siemens Energy & Automation, Inc. (*Id.* 35)

**4.** Plaintiffs are Fireman's Fund Insurance Companies and two of its subsidiaries. For ease of expression, the Court refers to all of the plaintiffs as "FFIC."

**5.** Allis' reimbursement obligations were secured by multimillion dollar letters of credit. (Granofsky Aff.Ex. 7, at 4)

ered in this process (*id.* 46), doubtless on the assumption that Siemens would continue to handle them under the Transfer Agreement indemnity.

### The Plan of Reorganization

On September 14, 1988, Allis filed its plan of reorganization, which was confirmed on October 31, 1988 (the "Plan"). The provisions of the Plan dealing with product liability claims are important to the resolution of this controversy.

The universe of existing and potential future products liability claims was divided into two classes. Class 7 consisted of all "Insured Claims," a defined term meaning, among other things, product liability claims arising out of events or occurrences prior to January 1, 1988 "to the extent such Claims are covered by the" FFIC insurance policies. (Feuss Dep.Ex. 9, § 2.7 & Ex. A, at 9) Class 8 included, in addition to claims of other general unsecured creditors, "Other Product Liability Claims," which was defined in relevant part to include product liability claims arising from events or occurrences on or after January 1, 1986.[6] (*Id.* § 2.8 & Ex. A, at 11) As will appear, the treatment of the two classes was quite different.

The Plan created two trusts, the Product Liability Trust and the Reorganization Trust, each of which received from the debtor certain cash and non-cash assets. (Feuss Dep. Ex. 9, Art. IV) In consideration of these transfers, the Reorganization Trust assumed all of the debtor's obligations to make cash distributions in respect of allowed Class 8 claims, among others. (*Id.* §§ 4.2A, 4.3) The Product Liability Trust in turn assumed the obligations of both the debtor and the Reorganization Trust to make cash distributions in respect of allowed Other Product Liability Claims. (*Id.* § 4.2B)

Class 7 claims were unimpaired and were to be liquidated and paid in cash in full "in accordance with the Fireman's Fund Settlement Agreement and the Fireman's Fund ... Insurance Policies." (*Id.* § 3.7) Class 8 claims, on the other hand, were impaired. Holders of such allowed claims were to re-

ceive *pro rata* shares of cash and certain common stock as provided in the Product Liability Trust Agreement. (*Id.* § 3.8A) It is common ground that Class 8 product liability claimants would not receive anything approaching one hundred cents on the dollar.

The Plan's treatment of present and future product liability claims left a number of potential issues unresolved. To begin with, the use of a product liability trust to pay claimants on an impaired basis, although incorporated in earlier plans, was untested. It remained possible that a successful challenge to the concept would result in the reorganized Allis having full dollar liability to such claimants. (Braza Dep. 70–71) Moreover, the rights of a Class 7 claimant, to the extent of any recovery in excess of the available insurance, were unclear. (*See id.* 272–74) The possibility existed of a claim against reorganized Allis for the excess. (*See id.* 221–22)

### The Allis–Siemens Settlement

Siemens and Allis had substantial disputes in the bankruptcy proceedings as well. Among many other issues entirely unrelated to this case, Siemens took the position that it was entitled to set off against its obligation to defend and indemnify Allis under the Transfer Agreement claims that it had against the debtor. Allis, for its part, contended that Siemens' assertion of the right of setoff violated Section 362 of the Bankruptcy Code.

The Allis–Siemens disputes were resolved by a post-confirmation agreement concluded in approximately June and approved by Judge Lifland on August 15, 1989. (Granofsky Exs. 9–10; Braza Dep.Ex. C, at B0194–98) The relevant provisions of the agreement, with the portions upon which the parties rely most heavily italicized, stated:

"3. <u>Indemnification</u>. *Siemens ... agrees to assume, discharge, indemnify and hold harmless [Allis], the Reorganization Trust, and the Product Liability Trust from any and all claims, losses, expenses or liabilities of any kind or nature now in existence or hereafter arising from, or relating to, the conduct of the*

---

**6.** The Court notes that the Class 8 claims included some claims covered by insurance despite the

perhaps contrary characterization of Class 7 as "Insured Claims." (Braza Dep. 164)

*business of the former [EPG] including, but not limited to, ... (b) those relating to products, including parts, manufactured by the former [EPG] as of January 1, 1978,* including any predecessor models or versions of such products regardless of whether the date of manufacture, sale or services was before or after January 1, 1978, including any uninsured litigation which was pending as of January 1, 1978 in which a defect in such a product is asserted ...

"4. <u>Compromise and Settlement of Claims for Which [Siemens] Has Agreed to Indemnify [Allis], the Reorganization Trust and the Product Liability Trust.</u> [Allis], the Reorganization Trust and the Product Liability Trust ... agree under the conditions described below to attempt to compromise and settle all product liability claims brought against [Allis] and [Siemens] for which [Siemens] has agreed to indemnify [Allis], the Reorganization Trust and the Product Liability Trust as provided in paragraph 3 above.

"The parties agree to exchange a separate letter stating the current status of all claims subject to this paragraph.

"[Allis], the Reorganization Trust and the Product Liability Trust further agree (a) to consult with [Siemens] with respect to the compromise and settlement of all claims, and (b) that no compromise and settlement shall be made without the consent of [Siemens]. If consent to a proposed compromise or settlement is withheld by [Siemens] over the recommendation of the Reorganization Trust or the Product Liability Trust or if the parties agree that settlement by negotiation is not available, [Siemens] shall immediately assume defense and all further activity with regard to the particular claim, and [Siemens] will directly assume and pay all costs of defense....

\* \* \* \* \* \*

7. It also carried forward Allis' obligation to indemnify Siemens with respect to transformer group products.

8. Although Siemens had been responsible for these cases before the bankruptcy, Section 4 of

"It is the intention of [Siemens] to utilize the services of the Reorganization Trust and Product Liability Trust only for purposes of attempting to effectuate a settlement. Accordingly, it is the intention of [Siemens] to retain all counsel and experts in connection with the analysis and defense of the claims. [Siemens] agrees that it shall reimburse [Allis], the Reorganization Trust and the Product Liability Trust for [expenses relating to the administration of claims.] *Nothing in this Agreement shall be construed to in any way expand any obligations of [Siemens] for payment to either [Allis], the Reorganization Trust, or any third-party beyond the obligations of [Siemens] to indemnify and reimburse [Allis], the Reorganization Trust and the product [sic] Liability Trust as expressly provided by this Agreement."* (Granofsky Ex. 9, §§ 3–4)

As is readily apparent, the language of Section 3 of the Allis–Siemens settlement agreement was identical in all material respects to that of the relevant provision of the Transfer Agreement [7] save that it included as indemnitees the Reorganization and Product Liability Trusts.

### The Dispute Arises

#### The August 9, 1989 Meeting

On August 9, 1989, even before Judge Lifland approved the settlement, representatives of Allis and Siemens met to discuss the procedures for handling the existing product liability claims for which Siemens was responsible,[8] which at the time included *Griffith* and *Shook.* (Feuss Dep., June 5, 1996 [hereinafter "Feuss Dep. II"], 7) On August 22, 1989, one week after Judge Lifland approved the Allis–Siemens settlement agreement, Siemens' inside counsel, Linda Feuss, wrote to Allis, purportedly to confirm the August 9, 1989 discussion, and provided the list of pending cases "which, it was agreed, fall within the scope of the Settlement Agree-

the Allis–Siemens settlement agreement created a new mechanism pursuant to which Siemens sought to take advantage of the Product Liability Trust to reduce its exposure.

ment. . . ." (Granofsky Aff.Ex. 11) The list included the *Griffith* and *Shook* cases.[9]

*Siemens Withdraws in* Griffith *and* Shook

Notwithstanding the August 22 letter, Siemens, in relatively short order, withdrew from the defense of the *Griffith* and *Shook* cases in circumstances that are subject to some dispute. Having reviewed all of the evidence, the Court finds that the following occurred.

On August 16, 1989, counsel for Shook filed a motion in the Bankruptcy Court for relief from the automatic stay (Granofsky Aff.Ex. 12, at 2), apparently on the ground that Shook's claim was covered by the FFIC policies and, in consequence, that there was no reason to delay prosecution of the claim. In October, FFIC confirmed to Shook's counsel, without admitting liability, that the claim fell within a FFIC policy. (Solano Dep.Def.Ex. 2) Accordingly, on November 8, 1989, Judge Lifland approved a stipulation confirming that the automatic stay as to *Shook* had been lifted. (Granofsky Aff.Ex. 12) While the documentary record as to *Griffith* is not so clear, it is acknowledged that much the same thing happened in that case. (*See* Cpt ¶¶ 32–33; Ans ¶ 3)

In or about November or early December, news of these events reached Siemens' Feuss, albeit in somewhat distorted form. She was told that FFIC had acknowledged that the *Shook* case was within its policy (Granofsky Aff.Ex. 13), but assumed incorrectly that this acknowledgment meant that FFIC was taking over the defense.[10] (*See* Feuss Dep. I, 173) She was informed incorrectly that FFIC would be assuming the defense of *Griffith*. (Granofsky Aff.Ex. 13)

And she was told also that FFIC would be seeking indemnification from Siemens in *Shook*. (*Id*).

These developments precipitated a number of actions on both sides that are germane principally to the construction of the Allis–Siemens agreement and, accordingly, are dealt with below. For present purposes, it suffices to note that Siemens caused the counsel whom it had engaged to defend *Shook* and *Griffith* to withdraw, whereupon FFIC engaged counsel to provide a defense.[11] Neither Allis, the trusts, nor FFIC ever consented to this action.

Given Siemens' position, FFIC assumed the defense of the *Griffith* and *Shook* cases, settling both during 1991, *Griffith* for $200,000 and *Shook* for $1,175,000. FFIC also paid $34,484.56 to defend these claims. It is these costs, totaling $1,409,484.56, that it now seeks to recover.

The case in its present posture presents essentially two issues. First, are the *Griffith* and *Shook* cases within the scope of Siemens' obligation to indemnify? Second, assuming they are, is FFIC entitled to recover its payments as subrogee of the indemnities?

## II

The basic positions of the parties on the first issue may be stated briefly.

FFIC contends that the Allis–Siemens settlement agreement, like the Transfer Agreement, obliges Siemens to indemnify Allis for all defense, liability and settlement costs in product liability cases arising out of the business of EPG, cases that concededly include

---

9. The August 9 meeting and the August 22 letter are matters of substantial dispute, as is discussed below.

10. *Shook* and *Griffith* both had been within the FFIC policies prior to the bankruptcy filing. Siemens nevertheless had defended both. . Feuss' December 8, 1989 letter to the Product Liability and Reorganization Trusts purports to recite Feuss' knowledge concerning FFIC's involvement in *Shook* and *Griffith* and to "clarify" understandings allegedly reached previously with Allis. Granofsky Aff.Ex. 13. It is important to note that the Court finds, contrary to Feuss' statement, that FFIC did not agree to assume the defense of *Griffith* before Siemens withdrew its

defense. The Court's findings as to the understandings Feuss purported to confirm, as appears below, also vary from Feuss' statements.

11. Feuss claimed in her deposition that she did not instruct defense counsel in *Griffith* to withdraw, merely raising with him the question whether FFIC's position created a conflict for him, subsequent to which he made his own decision. (Feuss Dep. II 5, 28–34) She acknowledged, however, that counsel was in no doubt that Siemens no longer would pay his fees. (*Id.* 33–34) Siemens, moreover, has admitted that it instructed counsel in both cases to withdraw. (Ans ¶¶ 10–13)

*Griffith* and *Shook.* It points to Section 3 of the settlement agreement, which is essentially the same as the clause of the Transfer Agreement under which Siemens defended these two cases for years, and to Siemens' post-settlement acknowledgment, in Feuss' August 22, 1989 letter, that Siemens was responsible for those suits. To the extent that there is any ambiguity, it contends that the negotiating history of the settlement agreement supports the conclusion that Siemens' indemnification obligation with respect to such cases is unqualified.

Siemens' position is quite different. According to Siemens, the negotiating and drafting history of the Allis–Siemens settlement agreement clearly shows that Siemens undertook to indemnify Allis only with respect to Class 8 product liability claims. As the *Griffith* and *Shook* cases were, or were treated as, Class 7 claims, Siemens maintains that they are beyond the scope of its indemnity. It relies also upon certain alleged admissions and conduct as demonstrating that Allis so understood the agreement.

*Ambiguity and the Parol Evidence Rule*

 The parol evidence rule prohibits consideration of extrinsic evidence to vary, contradict, add to or explain the terms of a completely integrated written instrument.[12] *Marine Midland Bank–Southern v. Thurlow,* 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419, 425 N.E.2d 805, 806–07 (1981). If such an instrument is ambiguous, however, parol evidence is admissible to help explain the ambiguity. *Investors Insurance Co. of America v. Dorinco Reinsurance Co.,* 917 F.2d 100, 104 (2d Cir.1990). On one view of this case, the settlement agreement unambiguously covers the claims at issue and no extrinsic evidence whatsoever may be considered. On another, the contract is ambiguous and, in consequence, resort may be had to parol evidence to determine the intention of the parties. Hence, the case first requires a determination whether the agreement is ambiguous[13] and then a construction of the contract against the body of evidence appropriately considered. This requires consideration of how the determination as to the existence of ambiguity is to be made.

There are many statements in cases applying New York law[14] to the effect that the determination whether a contract is ambiguous is made "by reference to the contract alone." *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990) (collecting cases); *accord, Hanson v. McCaw Cellular Communications, Inc.,* 881 F.Supp. 911, 916–17 (S.D.N.Y.1995), *aff'd,* 77 F.3d 663 (2d Cir.1996). Furthermore, many courts have stated that reference to surrounding circumstances may be had if an agreement is ambiguous, thus implying that the court must determine the existence of ambiguity from the four corners of the instrument. *Teitelbaum Holdings v. Gold,* 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 559, 396 N.E.2d 1029, 1031–32 (1979); *M.J. Peterson Real Estate, Inc. v. Krantz,* —— A.D.2d ——, 641 N.Y.S.2d 942, 943 (4th Dep't 1996). On the other hand, noted scholars have written that extrinsic evidence of the context in which a contract was executed always is admissible because words, whatever their apparent clarity, take on meaning from the circumstances in which they are used. *E.g.,* 3 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 536 (1960); 9 WIGMORE ON EVIDENCE § 2470 (Chadbourn rev. 1981); RESTATEMENT (SECOND) CONTRACTS § 2021 & cmt. b (1981). There are suggestions that New York adheres to this view, although the possible inconsistency with the requirement that ambiguity be determined from the four corners of the contract remains unsolved. *See, e.g., Utica City National Bank v. Gunn,* 222 N.Y. 204, 208,

---

**12.** It is undisputed that the agreement at issue constitutes a completely integrated contract. (Granofsky Aff.Ex. 9, § 13)

**13.** In denying the cross motions for summary judgment, the Court observed that the contract was ambiguous and that there were genuine issues of fact material to its construction in its order of October 12, 1995. The Court has reconsidered.

**14.** The parties have briefed the case on the assumption that it is governed by New York law. In any case, the Court applies New York law where, as here, there is no suggestion that the case is controlled by the different rule of another jurisdiction. *See M.H. Segan Ltd. Partnership v. Hasbro, Inc.,* 924 F.Supp. 512, 522 (S.D.N.Y. 1996).

118 N.E. 607 (1918); *Brady v. Cassidy,* 104 N.Y. 147, 155, 10 N.E. 131 (1887); *Hotel Credit Card Corp. v. American Express Co.,* 13 A.D.2d 189, 193, 214 N.Y.S.2d 921, 925 (1st Dept.1961); *see Aron v. Gillman,* 309 N.Y. 157, 163, 128 N.E.2d 284 (1955).

■ If the frame of analysis for purposes of determining ambiguity as to whether the *Griffith* and *Shook* cases are within the scope of the indemnity obligation is properly confined to the settlement agreement itself, the answer is straightforward. Section 3 states, as clearly as the Court can imagine, that Siemens agreed to indemnify against "any and all claims, losses, expenses or liabilities of any kind or nature . . . arising from, or relating to, the conduct of the business of the former [EPG] including . . . those relating to products . . . manufactured by the former [EPG] as of January 1, 1978. . . ." (Feuss Dep.Ex. 6) There is no reasonable basis in this language for a difference of opinion. *See, e.g., Seiden Associates, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992).

The question is a shade closer if the context in which the agreement was signed is considered. As indicated, the Plan divided the product liability claimants into two classes: (1) the Class 7 claimants, who would be paid in full by FFIC to the extent that there was coverage available under the FFIC policies, and (2) the Class 8 claimants, whose claims were impaired and would be paid in part by the trusts established under the Plan. In either case, the direct liability of Allis, absent a successful challenge to the Plan or perhaps a recovery by a Class 7 claimant in excess of the FFIC insurance limits, was eliminated as a practical matter although, of course, the newly created liability of the trusts stood in part in its place.

■ Whether an agreement is ambiguous turns on whether the contractual language

"is reasonably susceptible of more than one interpretation. . . ." *Burger King Corp.,* 893 F.2d at 527. Against the changed landscape created by the Plan, it perhaps is arguable, although doubtful, that Siemens' proposed construction of the contract—that the obligation to indemnify extends only to Class 8 claims—is sufficiently reasonable to render the agreement ambiguous and thus permit resort to parol evidence. But the issue need not be determined because the Court, upon consideration of all of the evidence, finds that the construction advanced by FFIC reflects the intention of the parties, viz. that the parties intended Siemens' indemnity obligation to extend to the *Griffith* and *Shook* cases irrespective of whether they were Class 7 or Class 8 claims.

### The Evidence

■ As indicated in the preceding section, the language of the indemnity, considered in pristine isolation, clearly covers the *Griffith* and *Shook* claims. It simply is undeniable that they are "claims . . . arising from . . . the conduct of the business of the former [EPG] . . . relating to products . . . manufactured" by it. This is confirmed by Siemens' actions prior to the Allis bankruptcy.[15] Siemens in fact accepted the obligation to defend and indemnify Allis with respect to those cases under the Transfer Agreement, the operative language of which was identical to that of the settlement agreement now at issue. The question therefore is whether any of the evidence now relied upon by Siemens alters this conclusion.

### The Negotiating History of the Settlement Agreement

Siemens maintains that the negotiating history of the settlement agreement confirms its view that Siemens agreed to indemnify only with respect to Class 8 claims. The Court finds otherwise.

---

15. Where an agreement is ambiguous, the practical construction placed upon it by the parties is powerful evidence of their intention. *Ingrassia v. Shell Oil Co.,* 394 F.Supp. 875, 883 (S.D.N.Y. 1975); *Webster's Red Seal Publications v. Gilberton World–Wide Publications,* 67 A.D.2d 339, 341, 415 N.Y.S.2d 229 (1st Dep't 1979), *aff'd,* 53 N.Y.S.2d 643, 438 N.Y.S.2d 998, 421 N.E.2d 118 (1981); *Hart v. John G. Hellman Co.,* 17 A.D.2d 438, 444, 235 N.Y.S.2d 23 (1st Dep't 1962), *aff'd,* 13 N.Y.2d 633, 240 N.Y.S.2d 612, 191 N.E.2d 96 (1963).

### 1. The October 26, 1988 Meeting

During the course of the bankruptcy, Allis, Siemens, and two of Siemens' affiliates [16] had a number of disputes, which by no means were limited to the product liability issues. Just prior to the confirmation of the Plan, the parties scheduled a meeting for the purpose of exploring the possibility of settling their differences.[17]

The parties met on October 26, 1988 for many hours at the offices of Davis, Polk & Wardwell, one of the law firms representing Allis in the bankruptcy. Among the key participants on Allis' behalf were Mary Kay Braza and Robert DuPuy of the Milwaukee firm of Foley & Lardner. Siemens was represented principally by William Rochelle, then of Kronish, Leib, Weiner & Hellman, and by Linda Feuss, an in-house lawyer. The testimony concerning what took place conflicts to a considerable extent. The notes taken by participants are fragmentary, incomplete and subject to considerable uncertainties.[18] On the basis of all of the evidence, the Court finds as follows.

Early in the meeting, Braza, assisted by DuPuy, presented Allis' position, issue by issue, for at least an hour. (Braza Dep. 29–34) Braza stated that Allis wished the Transfer Agreement cross-indemnity obligations to remain in effect. (Id. 38, 61–62) She pointed out that this would benefit Siemens because the consequences to Siemens of changing the arrangement would be adverse to it. Allis would insist on obtaining an actuarial determination of the value of Siemens' indemnification obligation and seek to collect that lump sum, which it thought would be millions of dollars, in the bankruptcy. If Siemens agreed to continue the previous arrangement, however, it would retain control over the defense of the claims and, presumably, benefit from its own insurance coverage of its indemnity obligations. (Id. 38–39)

Following this presentation, one of the Siemens' representatives asked who would benefit if Siemens reassumed its indemnity obligations. (Id. 43–44; DuPuy Dep. 15) John Grigsby, one of the Allis representatives, responded by explaining that Allis would not tender cases that Siemens had been defending to FFIC. He described the manner in which the Allis–FFIC settlement had been reached, told Siemens that the premium that had been agreed for conversion of the retrospective premium policies had not taken into account the cases that Siemens was defending, and said that, as a business matter, he could not ask FFIC to take them on. (Braza Dep. 45–47; Braza Dep.Ex. C, at B0273) He went on to say that the beneficiary of Siemens' continued indemnity probably would be the Product Liability Trust. (Braza Dep. 53–54; Braza Dep.Ex. C, at B0273)

The parties then took a long break during which each side discussed the other's position. (See Braza Dep. 74; DuPuy Dep.Ex. 1N) When they reassembled, Rochelle made a lengthy proposal on behalf of Siemens. Insofar as it dealt with the product liability indemnity issue, he suggested that Siemens would indemnify the relevant trust for unasserted future claims, but that the existing lawsuits (which included Griffith and Shook) should be made liabilities of the Reorganization Trust and that Siemens would take no responsibility for them. (Braza Dep. 77; Feuss Dep.Ex. 2, at S000037; DuPuy Dep. 25–26; DuPuy Dep.Ex. 1N–1O)

The Allis representatives viewed Rochelle's proposal as ridiculous and angrily said so. (DuPuy Dep. 28; see Braza Dep. 78; Braza Dep.Ex. C, at B0284) They indicated that the parties were not even close to a settlement and suggested that Siemens reconsider its position. (Braza Dep. 78–79)

Following another caucus, Siemens returned with a revised proposal. (Braza Dep. 79; DuPuy Dep.Ex. 1O) Siemens again sug-

---

**16.** Utility Power Corporation and Siemens AS also were involved. (Braza Dep. 29–30)

**17.** In anticipation of the meeting, Allis sent Siemens and its counsel a letter and an outline of its view of each of the outstanding disputes between the two sides. (Braza Dep.Ex. C, at B0326–49; Braza Dep. 23–24)

**18.** As might be expected, the notes reflect not only the note takers' perception of statements made at the meeting, but their own ruminations about the implications of such statements, possible responses and courses of action, reminders to themselves, statements made at caucuses at which only one side was present, and other thoughts that were not communicated at the meeting. (DuPuy Dep. 12–13; Feuss Dep. I 69–71; see Braza Dep. 27, 31–32, 35–36)

gested that it be relieved of any obligation with respect to past product liability claims, but that it would assume liability for future claims. (Braza Dep. 79–80; Braza Dep.Ex. C, at B0285; DuPuy Dep.Ex. 1P)·

Allis reiterated that it wished "to just pick up the transfer agreement essentially as is and keep that ongoing"—in other words, that Siemens would continue to indemnify for both existing and future products claims involving the EPG and that Allis would continue its cross-indemnity for transformer group products. (Braza Dep. 81–82) Allis offered, however, that it might be able to assist Siemens in settling the existing cases by making available an individual that Allis was retaining who had been effective at settling claims in other bankruptcies. (*Id.* at 82; *see id.* 110) Siemens responded that it had no intention of giving up control of the cases, although it did not reject the possibility of assistance. (*Id.* 83) This in turn led to a discussion of whether the claims could be settled in the bankruptcy on an impaired basis, thus reducing the amount of Siemens' indemnity obligation actually paid out for these cases rather than the full amounts of the claims. (*See* Braza Dep. 83–85; DuPuy Dep. 24; DuPuy Dep.Ex. 1Q–1R; Feuss Dep. I 87–88, 95–99, 114, 117–19)

In the final analysis, the parties agreed that the indemnities in the Transfer Agreement would be carried forward with respect to both existing and future claims (Braza Dep. 87, 169) and that Allis would endeavor to assist Siemens by having claims settled by the Reorganization Trust which, to the extent the effort succeeded, would give Siemens the benefit of the impairment of claims in bankruptcy by reducing the amount of Siemens' indemnity obligation to the amounts actually paid by the trust.[19]

Siemens contends, as Feuss testified, that the parties agreed that the indemnity obligation would extend only to Class 8 claims. (Feuss Dep. I 99–100) The Court does not credit that assertion. At an early point in the meeting, someone on the Siemens side inquired whether the plaintiffs in the existing products liability cases (which included *Griffith* and *Shook*) had filed proofs of claim in the bankruptcy.[20] Allis confirmed that they had, and a Davis Polk associate present at the meeting commented that they were Class 8 claimants as, indeed, was believed at the time. (Braza Dep. 54–55, 159–61; Braza Dep.Ex. C, at B0273; Feuss Dep. I 80–82; Feuss Dep.Ex. 3, at S000041) There was a brief discussion also concerning how Class 8 claims would be treated under the Plan. (Feuss Dep. 83) But there was no agreement to limit Siemens' indemnification obligation to Class 8 claims. Indeed, the Court finds that no such suggestion ever was made.[21]

### 2. The Drafting of the Settlement Agreement

The drafting of the agreement setting forth the understanding reached on October 26, 1988 took a great deal of time, but its history confirms the Court's conclusion.

The first draft was prepared by Braza and sent to Rochelle and Feuss on November 16, 1988. (Braza Dep. 91; Braza Dep.Ex. C, at B0350–51, B0044–53) Section 3 was identical in all material respects to the corresponding

---

**19.** It should be noted that the success of the effort was thought to depend on claimants remaining ignorant of Siemens' indemnity.

**20.** The motive in asking the question, the Court infers, was to determine whether the plaintiffs were foreclosed from proceeding by virtue of any failure to file a proof of claim prior to the bar date. *See* 11 U.S.C. §§ 501–02. This of course would have reduced the potential aggregate product liability exposure.

**21.** The Court does not find Feuss' contrary testimony persuasive. Nor does it accept Siemens' contention that it was told at the meeting that there was no insurance for the *Griffith, Shook*

and other Transfer Agreement cases. Rather, the Court finds that the parties proceeded on the assumption that Allis, consistent with pre-petition practice, would not ask FFIC to handle those matters. While there are suggestions in some of the notes that there was discussion on the premise that FFIC had declined or would decline coverage, the Court credits DuPuy's explanation, viz. that the parties should consider those cases *as if* FFIC had declined coverage because Allis was not willing to request that FFIC assume those defenses. (DuPuy Dep. 21) Indeed, Feuss admitted that Allis did not tell Siemens that the FFIC policies did not cover the Transfer Agreement cases. (Feuss Dep. I 122)

parts of both the Transfer Agreement and the final settlement agreement save that the Transfer Agreement and the initial draft listed Allis as the sole indemnitee whereas the trusts were added as indemnitees in the final settlement agreement. Section 4 provided that Allis would seek to compromise existing product liability claims in the bankruptcy and enumerated the pending cases, including *Griffith* and *Shook.* (Braza Dep.Ex. C, at B0048–49)

Rochelle responded on November 29, 1988 by fax with a revised draft. (Braza Dep. 99; Braza Dep.Ex. C, at B0057–67) The operative portion of Section 3 was identical to Braza's draft in the respects relevant here. (Braza Dep.Ex. C, at B0060–63) He proposed changing Section 4 by introducing it with the phrase "[a]ny provisions in this Settlement Agreement and Release to the contrary notwithstanding . . ." and adding a new paragraph limiting Siemens' indemnity obligation to "the amount which any such claimant . . . would have received as an unsecured creditor" under the Plan. (*Id.* at B0062–63)

The proposal concerning Section 4 did not meet with favor at Allis. Braza felt, among other things, that the additions could undermine the broad language of the indemnity contained in Section 3. (Braza Dep. 103–05) The fear was that Allis could find itself without benefit of the indemnity for any difference between any liability to a claimant and the amount the claimant would have received as an unsecured creditor. So Braza prepared a new draft which she sent to Rochelle on February 14, 1989. (Braza Dep. 106–07; Braza Dep.Ex. C, at B0352–53; *id.* at B0070–82) The new draft added the Reorganization Trust as a party, added both trusts as indemnitees under Section 3, and dropped the objectionable language in Section 4. (Braza Dep. 108; Braza Dep.Ex. C., at B0070–82)

On February 27, 1989, Rochelle spoke with Braza concerning the February 14 draft. He asked that Allis reconsider its position regarding Section 4 and that the Product Liability Trust be made a party, but he took no material exception to the indemnity clause,

Section 3, in Braza's draft. (Braza Dep. 109–12; Braza Dep.Ex. C, at B0083–95)

By May 4, 1989, the proposed contract had gone through at least two more drafts, but the parties had not reached agreement on Section 4. Rochelle then wrote to DuPuy[22] to propose new language for that clause which would have ensured that Siemens, rather than the trust, would control the retention and payment of attorneys in cases which the trust would seek to settle. (Braza Dep.Ex. C, at B0161–65) DuPuy responded on this and other matters on May 19, 1996, taking issue with many of Rochelle's suggestions. (Braza Dep.Ex. C, at B0363–67; Braza Dep. 126–33) Finally, after further exchanges, the agreement was signed in its present form.[23]

There are two important points to be drawn from the drafting of the settlement agreement, neither of which is helpful to Siemens. First, despite eight months of negotiation in which both sides were represented by skilled counsel who pored over every word and comma of a multitude of drafts, there is not a hint that either party thought that Siemens' obligation to indemnify extended only to Class 8 claims. Indeed, the phrase does not appear even once in the agreement, the drafts, or any of the correspondence between counsel during the course of preparing the agreement.

Second, the fact that the settlement agreement in relevant part carried over the precise language of the Transfer Agreement, save for the addition as indemnities of the two trusts, speaks volumes. It supports Braza's testimony, which the Court credits, that the parties agreed on October 26, 1988 that "the indemnities in the transfer agreement were going to continue forward with the parties continuing as they had in the past." (Braza Dep. 88)

*Siemens' Other Arguments*

Siemens remaining contentions regarding the scope of the indemnity are more speedily disposed of.

---

22. Braza had gone on leave.

23. The final version eliminated the enumeration of specific cases in Section 4.

### 1. Rejection of the Transfer Agreement

Section 8 of the settlement agreement provides in substance that the Transfer Agreement is deemed rejected by the debtor as an executory contract under Section 365 of the Bankruptcy Code, a circumstance from which Siemens seeks to draw comfort. (Granofsky Aff.Ex. 9, § 8) Siemens, to be sure, sought that language in the agreement. Given the fact that the operative language of Section 3 of the settlement agreement is identical in all material respects to the corresponding part of the Transfer Agreement, however, the significance of this point escapes the Court, and Siemens' briefs shed no light on it. (Def.Tr.Br. 28, 35)

### 2. The August 9 Meeting and the August 22 Letter

As noted above, the parties met on August 9, 1989, following the execution of the settlement agreement, to discuss procedures for handling the then-existing product liability cases. Siemens contends that the conversation at the meeting confirmed that the indemnity did not extend to Class 7 claims. According to Feuss, Allis advised Siemens that FFIC had denied coverage of these cases following which Siemens, without objection, "made it clear that if Fireman's Fund had coverage, then Siemens was not going to handle these cases...." (Feuss Dep. II 8–9; Def.Tr.Br. 37–38) The credible evidence, however, does not bear out this contention.

Early in the meeting, Allis advised Siemens that the *Griffith* case had been tendered to FFIC by the plaintiff's lawyer, who claimed that the suit was within the FFIC policy and therefore a Class 7 claim despite the fact that it had been scheduled or classified as Class 8 in the bankruptcy. (DuPuy Dep. 39; DuPuy Dep.Ex. 2A) Allis then reported that Davis Polk had advised that FFIC could not deny coverage, that FFIC would be subrogated to Allis, and that FFIC then could pursue Siemens for indemnification. (DuPuy Dep. 40; DuPuy Dep.Ex. 2A)

Siemens responded by acknowledging its responsibility for the Transfer Agreement cases. (DuPuy Dep. 40; DuPuy Dep.Ex. 2B) It stated that it did not want FFIC involved. (DuPuy Dep. 40, 46–47; DuPuy Dep.Ex. 2B) It added that it had told Allis' Ron Huntley[24] that it would not indemnify for Class 7 claims and that Siemens would proceed to defend the cases. (DuPuy Dep.Ex. 2B)

On August 22, 1989, Feuss wrote to DuPuy to confirm the understandings reached at the August 9 meeting. (Granofsky Aff.Ex. 11) She attached a list of cases, including *Griffith* and *Shook*, that were agreed to be covered by the settlement agreement. The letter set out procedures for dealing with settlement overtures, noting that "[s]ettlement authority will be determined by the responsible Siemens attorney...." (*Id.* at 1) In the event cases were settled, the responsible trust was to issue a check and Siemens would reimburse it by wire transfer. (*Id.*) The letter went on to confirm procedures for handling future suits covered by the indemnity. (*Id.* at 2–3) It then stated:

> "Finally, we discussed Allis['] possible tender of all of these cases to Fireman's Fund. Allis ... advises that Fireman's Fund has denied coverage. Accordingly, it was agreed that these cases would be covered by the indemnification obligations of Siemens under Paragraph 3 of the Settlement Agreement. Any disputes as to Fireman's Fund coverage are between Allis ... and Fireman's Fund." (*Id.* at 3–4)

The letter closed with a request that DuPuy indicate his agreement with the letter by returning a signed copy of the letter. (*Id.* at 4) DuPuy did so.

Siemens argues that the letter demonstrates that the indemnity contained in Section 3 of the settlement agreement extended only to Class 8 claims and that it accepted responsibility for *Griffith* and *Shook* only on the representation that FFIC had denied coverage. DuPuy's signature on the letter, moreover, is said to have reflected his agreement that this indeed was the substance of the parties' agreement. The Court is unpersuaded.

To begin with, the Court is convinced that Feuss' letter did not accurately state what

---

**24.** Huntley monitored cases for Allis. (Dupuy Dep. 41) There is no credible evidence that he had any knowledge of or responsibility for Allis' arrangements with Siemens.

transpired at the meeting. Contrary to her assertion, Siemens was not advised that FFIC had denied coverage. Indeed, it never did so. (*See* Braza Dep. 194–95) All that Feuss was told about the tender of the *Griffith* case was that the *Griffith* plaintiff had taken the position that his claim was covered by the FFIC policies and therefore should be in Class 7 and that Fireman's Fund had no choice but to accept. Hence, Siemens, again contrary to Feuss' letter, did not agree that the cases were within the indemnity because Fireman's Fund had denied coverage, as Siemens contends follows from the use of the word "[a]ccordingly."

Siemens' opposition at the August 9 meeting to FFIC involvement also is instructive. If, as Siemens now claims, it believed that its indemnity obligation extended only to Class 8 claims—claims not covered by the FFIC policies—and that it has no liability to FFIC as subrogee with respect to payments made by FFIC to dispose of Class 7 claims, Siemens should have welcomed FFIC's involvement with open arms. FFIC's interposition would have let Siemens off the hook entirely. Its opposition to FFIC involvement therefore is explicable only on the basis that it understood that its indemnity extend to claims defended by FFIC and that, as Davis Polk had advised, it would be subject to possible liability to FFIC as subrogee.

What, then, is to be made of the portion of Feuss' August 22 letter upon which Siemens so heavily relies and of DuPuy's apparent agreement with it? Feuss' actions are readily explained. As the discussion at the October 26, 1988 meeting and the drafting history of the settlement agreement show, Siemens repeatedly sought to limit its indemnity obligation to future products liability claims. Allis steadfastly rejected all of these efforts and ultimately won a continuation of the Transfer Agreement indemnity provisions.

The new element introduced into the situation by the *Griffith* plaintiff's approach to FFIC gave Feuss an opening for seeking to revise the deal Siemens had made, and Feuss sought to take advantage of it.[25] Whatever the motive, however, the Court is persuaded that Feuss' letter did not accurately recount what was said at the meeting concerning FFIC. And in saying that "Fireman's Fund has denied coverage [and a]ccordingly, it was agreed that these cases would be covered ..." she did not accurately state the parties' understanding. The cases were within Siemens' indemnity, irrespective of whether FFIC covered them, because they were within the scope of Section 3. Her letter was an attempt to elicit some statement from DuPuy that could be used to support a litigation such as the one now at Bar or a product of wishful thinking.

DuPuy's action in signing the copy of the letter is troublesome. The letter contained an incorrect statement of fact in reciting that FFIC had denied coverage. It certainly can be read as Siemens now reads it, i.e., as indicating that the Transfer Agreement cases were covered by Siemens only because FFIC had denied coverage, however contrary to the settlement agreement and its history that assertion was. The most that can be said is that the Court credits DuPuy's testimony that he did not so construe the letter. Rather, he mistakenly understood it only as confirming the arrangements that were worked out at the meeting. (DuPuy Dep. 56–62, 73–74; *see* Braza 196–201)

Taking the August 9 meeting and the August 22 letter together, they lend more support to FFIC than to Siemens. Siemens' resistance to FFIC's involvement in the Transfer Agreement cases is inconsistent with its present position. While DuPuy's countersignature of the letter lends some

---

25. Feuss' letter may have been the product either of selective perception of what was said at the August 9 meeting or of something else. It is unnecessary to resolve that question. The Court notes, however, that it does not place great weight on Feuss' testimony on this and other points. Certainly her account of the August 9 meeting is questionable. Among other problems, she professed no recollection as to whether she had been told at the meeting, as the contempora-

neous notes show, that Davis Polk had advised that FFIC could not decline coverage and that it would be able to pursue Siemens as subrogee for indemnification. (*Id.* 24–25) Given the importance of these matters to Siemens' position, the Court construes her testimony as reflecting an inability or unwillingness to make admissions rather than an accurate account of what transpired.

support to Siemens, the Court ultimately is convinced that he simply did not understand its implication, which in any event is contrary to the overwhelming weight of the evidence.

\* \* \* \* \* \*

■ In summary, if the determination of ambiguity properly is limited to the document itself, the Court holds that the clause unambiguously covers the *Griffith* and *Shook* claims. If the determination of ambiguity is not so limited, the Court holds as a matter of law and, alternatively, finds as a matter of fact,[26] that the clause covers those claims.

## III

The next question is whether FFIC is entitled, as Allis' subrogee, to indemnification pursuant to the settlement agreement for the amounts spent in defending and settling *Griffith* and *Shook*.

FFIC asserts that in paying the *Griffith* and *Shook* settlements and defense costs, it was discharging obligations of Allis and, in consequence, that it is subrogated to Allis' right to indemnification by Siemens for those payments. Siemens rejoins that FFIC's payments were its own independent obligations as a result of the Allis–FFIC settlement, that Allis has no right of recovery against Siemens because the *Griffith* and *Shook* claims were not within the scope of Siemens' indemnity[27] and, in any case, that any right to subrogation has been waived. The contentions are without merit.

*The Payments Were Not Independent Obligations*

■ One who makes a payment that is the primary obligation of the payor, as distinguished from a payment of the debt of another, is not entitled to subrogation. *E.g., Matter of Greenwald,* 114 B.R. 410, 413 (Bankr. S.D.N.Y.1990). On the other hand, an insurer who pays a claim on behalf of its insured ordinarily is subrogated to the rights of the insured against third parties. *Pennsylvania General Insurance Co. v. Austin Powder Co.,*

68 N.Y.2d 465, 471, 510 N.Y.S.2d 67, 70, 502 N.E.2d 982, 985 (1986). Hence, Siemens necessarily contends that the bankruptcy and the Allis–Siemens settlement converted FFIC's obligation under the insurance policies to indemnify Allis into a primary obligation of FFIC. It is mistaken.

Allis was the insured under the FFIC policies when it entered Chapter 11. FFIC remained obligated, notwithstanding the filing, to discharge its duties as insurer for the benefit of the bankrupt estate. Although (a) the estate benefited from the automatic stay of 11 U.S.C. § 362, and (b) the product liability plaintiffs became the holders of unsecured and unliquidated claims against the estate whose rights were subject to impairment in the reorganization, the plaintiffs nevertheless retained claims against Allis' estate on which Allis was the primary obligor and for which it had insurance notwithstanding the filing.

The dispute between Allis and FFIC concerned the payment of premiums on the insurance policies. The settlement involved the conversion of those policies from retrospective premium to more conventional insurance. The bargain ultimately approved by the Bankruptcy Court involved substantial payments to FFIC for the insurance and the continuation of the coverage. FFIC's agreement to continue the coverage thus enabled the estate to satisfy the claims of Class 7 creditors and was one of the building blocks used to effect the reorganization of the debtor. In these circumstances, the suggestion that FFIC's discharge of its obligations under the policies satisfied its own primary obligation cannot withstand scrutiny. Its actions discharged the obligations of the bankrupt estate to the Class 7 creditors.

Siemens points to the application to the Bankruptcy Court for approval of the Allis–FFIC settlement, which summarized the settlement by saying that FFIC would "assume full responsibility and liability on any and all claims covered by the 1981–1987 insurance

---

**26.** If the contract is unambiguous, its construction presents an issue of law for the Court. *Pouch Terminal, Inc. v. Hapag–Lloyd (America), Inc.,* 172 A.D.2d 735, 736, 569 N.Y.S.2d 122, 123 (2d Dep't 1991). If it is not, its construction is an issue for the trier of fact. *Id.*

**27.** This contention is disposed of by the preceding discussion.

policies" and stated that the debtor was given "a full release from liability to over 500 product liability and other claimants." (Def.Tr.Br. 11) (quoting Braza Dep.Ex. 3, Application, ¶¶ 37, 42) Focusing on the word "liability," it argues that the settlement eliminated Allis' primary obligation on the products claims and substituted a primary obligation of FFIC. It argues that:

> "Fireman's Fund did not pay on an obligation of Allis–Chalmers under the Plan and the two Trusts but did so pursuant to its own *contractual* obligation to Allis–Chalmers under the Plan and its settlement agreement with Allis–Chalmers ..." (Def.Tr.Br. 61) (emphasis in original)

But this is too glib a view.

While the combined effect of the Allis–FFIC settlement and the confirmation of the Plan was to allow a reorganized Allis to emerge from Chapter 11, free of the claims of Class 7 creditors, the exposure for which FFIC remained liable came about by reason of Allis' manufacture of allegedly defective products and that exposure was a claim against the assets of the bankrupt estate. FFIC agreed, in exchange for premium payments by the estate, to cover that exposure, subject to the terms and conditions of its policies. Its position in this case is no different from that of any insurer that pays a claim made against its insured.

### *There Was No Waiver of Subrogation*

 Siemens appears also to argue that FFIC's right to subrogation was waived. While its position is not entirely clear, it seems to revolve around two provisions of the Allis–Siemens settlement agreement.

The first of the provisions relied upon is Section 7, which provides in relevant part:

> 7. Release of Siemens Energy. Except as specifically provided in this Agreement, Allis–Chalmers, for itself and as former Debtor–In–Possession, its parent, subsidiaries ... *insurers*, successors, assigns and all others whom Allis–Chalmers may bind or control, and the Reorganization Trust and the Product Liability Trust, to the

extent empowered by their Respective Trust Agreements, hereby release and forever discharge Siemens ... and its divisions, officers, directors, employees, agents, representatives, insurers, successors and assigns for any and all claims, demands, actions, suits and liabilities of every kind and nature whatsoever, including, but not limited to, those claims specifically identified in the fourth paragraph of the recital section of this Agreement. Allis–Chalmers, the Reorganization Trust, and the Product Liability Trust acknowledge that this release extinguishes any and all existing claims, past, present or future, whether known or unknown, foreseen or unforeseen, without regard to whether such claims are liquidated or contingent, accrued or unaccrued, matured or unmatured, or whether they arise under or by virtue of contract, tort, statutory or other duties. (Granofsky Aff.Ex. 9, § 7) (emphasis added)

This, Siemens says, explicitly released FFIC's subrogation claim.

To begin with, even if the Allis–Siemens agreement were construed to purport to release FFIC's right of subrogation, FFIC was not a party to it. Notwithstanding the recital contained in the quoted language, Siemens has offered nothing to support its implicit assertion that Allis had the authority to release FFIC's right to subrogation. *See ICC Industries, Inc. v. GATX Terminals Corp.*, 690 F.Supp. 1282, 1286 (S.D.N.Y.1988).

 More basically, the agreement is not properly so construed. Although Section 7 in form is virtually a general release, it must be read to except from its operation any claims by Allis arising out of the settlement agreement itself. Section 7 did not release Allis' right to proceed against Siemens for breach of the indemnity contained in Section 3. As FFIC is suing under Section 3 as subrogee of Allis, it stands in Allis' shoes. *Pennsylvania General Insurance Co.*, 68 N.Y.2d at 471, 510 N.Y.S.2d 67, 502 N.E.2d 982. Hence, the release simply does not extend to this claim.[28]

---

28. Any suggestion that Section 7 should be construed as excepting from the release a claim by Allis, but subjecting to the release any claims by

its subrogees, also would be without merit. From Siemens' point of view, the most that can be said about Section 7 on that score is that it

■ Siemens' other argument rests on Section 4 of the Allis–Siemens agreement, which provides in relevant part that nothing in the agreement is to be construed to "expand any obligations of Siemens ... for payment to either Allis–Chalmers, the Reorganization Trust, or any third party beyond [its] obligations to indemnify and reimburse Allis–Chalmers, the Reorganization Trust and the Product Liability Trust as expressly provided by this Agreement." It contends that this language precludes any subrogation claim by FFIC because FFIC is a "third party" which was intended to enjoy no rights under the agreement.

The basic answer to Siemens' argument is that it wrenches the quoted language out of context. The wording appears at the end of Section 4, which does not contain the indemnity. Rather, it sets forth the mechanism pursuant to which the trusts would seek to settle claims—the vehicle by which the parties agreed to give Siemens a chance to benefit from the Allis Chapter 11 by attempting to settle indemnified claims on values reflecting the impairment of those claims in the bankruptcy. The natural reading of the language in context—which is overwhelmingly confirmed by the parol evidence of the negotiation and drafting of the agreement—is that it was intended to prevent product liability claimants from suing Siemens directly, claiming that they were third party beneficiaries of the indemnity contained in Section 3.

In sum, the Court finds that there has been no waiver of FFIC's right to subrogation.

### IV

For all of the foregoing reasons, the Court concludes that FFIC is entitled to judgment against Siemens in the amount of $1,409,484.56 together with prejudgment interest thereon at the rate of 9 percent from December 31, 1991.[29]

SO ORDERED.

---

reasonably is susceptible of two interpretations, viz. that it does or does not release claims on behalf of subrogees by reason of payments in respect of claims subject to the Section 3 indemnity. That being so, Section 7 is ambiguous. The record is clear that the issue of claims by subrogees was not even mentioned in the negotiation of the Allis–Siemens agreement. (Feuss, Dep. I, 134.) Nor, in view of the Court's finding that the parties intended to carry forward the indemnity previously contained in the Transfer Agreement, is there any reason to suppose that they intended to release such claims. Accordingly, the Court finds as a fact that Section 7 does not release any claims by subrogees in respect of payments made by them on claims subject to the Section 3 indemnity.

**29.** Plaintiffs are entitled to prejudgment interest at the indicated rate from the earliest date the cause of action existed. Although it is clear that FFIC made the payment at issue in 1991, there is no evidence as to when it did so. Bearing in mind that FFIC had the burden of proof on the issue, the Court finds that the date was not earlier than December 31, 1991. N.Y. CPLR §§ 5001, 5004 (McKinney 1992).