[No. F035149. Fifth Dist. Feb. 4, 2002.]

MARIANNA FISHER, Plaintiff and Appellant, v.
ALLIS-CHALMERS CORPORATION PRODUCT LIABILITY TRUST et
al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of subparts I.B. and I.C. and parts II. and III. of Facts and Proceedings and parts I., II. and sections 2. and 3. of subpart III.B. of the Discussion.

**COUNSEL**

Tony L. Cogliandro for Plaintiff and Appellant.

Haight, Brown & Bonesteel, Thomas N. Charchut, Lisa L. Oberg and Daniel J. Kelly for Defendants and Appellants.

## OPINION

**VARTABEDIAN, J.**—In this case, the widow of a man burned to death by hot oil expelled by a voltage regulator brought a products liability claim against the manufacturer of the regulator and the purported successor in interest of the manufacturer. On a postjudgment motion, the trial court ruled that (1) plaintiff was entitled to relief from defendants' requests for admission that were deemed admitted, (2) without the deemed admissions, summary judgment for defendant Allis-Chalmers Corporation Product Liability Trust (Allis Trust) was no longer appropriate, and (3) defendant Siemens Energy & Automation, Inc. (Siemens) remained entitled to summary judgment because it was not a successor in interest of Allis-Chalmers Corporation (Allis-Chalmers). All parties appeal. We conclude plaintiff should be relieved of the admissions, Allis Trust is not entitled to summary judgment, and the summary judgment in favor of Siemens must be reversed.

### FACTS AND PROCEEDINGS

### I. *The Accident and Claims Asserted*

On March 27, 1996, Norval Fisher was working as a substation maintenance electrician for Pacific Gas and Electric Company (PG&E) and investigated a problem with a load tap changer on a type AFR 12,000-volt, 3-phase voltage regulator (AFR Regulator) manufactured in approximately 1966 by Allis-Chalmers. Norval Fisher was fatally injured when hot or burning oil was expelled through the tap load changer's pressure release valve and struck him while he was standing at the AFR Regulator's control panel.

Norval Fisher's widow, Marianna Fisher (Fisher), sued Allis Trust and Siemens (collectively defendants) alleging a products liability claim on the grounds the AFR Regulator was defective because (1) the pressure release value was positioned in such a manner that oil expelled from the load tap changer compartment would hit individuals standing at the control panel; and (2) the internal components of the load tap changer became pitted, which resulted in the ignition of the oil expelled from the compartment.

### A. *Defendants' Defense on the Merits*

Allis Trust and Siemens defend the action on the basis that the accident was not caused by either a design or manufacturing defect in the AFR Regulator and that the sole cause of the accident that resulted in Mr. Fisher's death was PG&E's negligent maintenance, repair and inspection of the AFR

Regulator. Defendants contend (1) pitting, and the resulting electrical arcing, is a normal consequence of nearly 30 years of use; and (2) PG&E modified the load tap changer compartment by permanently sealing and capping its upper breather opening, thereby preventing the escape of air and gases from the compartment. Defendants contend the ignition of the oil expelled by the compartment was most likely caused by the buildup of combustible gases due to the plugging of the upper breather opening. In addition, Siemens contends it is not a successor in interest of Allis-Chalmers and, therefore, is not liable for claims related to the AFR Regulator.

**B., C.\***

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**II., III.\***

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISCUSSION

**I., II.\***

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**III. *Siemens as Successor in Interest of Allis-Chalmers***

Fisher appeals the December 6, 1999, judgment in favor of Siemens and the underlying order granting Siemens's motion for summary judgment. In ruling on Fisher's postjudgment motion, the trial court held the judgment in favor of Siemens would not be vacated because it was based on the finding that Siemens was not a successor in interest to Allis-Chalmers and did not rely on the deemed admissions that the trial court set aside. Fisher argues Siemens's motion for summary judgment was improperly granted because it did not contain a sufficient basis for eliminating any of the five theories of successor in interest liability recognized under California case law.

**A. *Facts***

Siemens's existence as a corporation began on July 14, 1972, when it was incorporated under the laws of the State of Delaware with the name "Allis-Chalmers Electric, Inc." This corporation was used by Allis-Chalmers and

---

*See footnote, *ante*, page 1182.

Siemens Aktiengesellschaft, a German corporation, as the business entity for their joint venture to manufacture and sell certain electrical products in the United States. The joint venture apparently took form in 1977 when the corporation's name was changed to "Siemens-Allis, Inc." and a "Shareholder Agreement between Allis-Chalmers Corporation and Siemens Aktiengesellschaft establishing Siemens-Allis, Inc." dated July 10, 1977 (Shareholder Agreement), was signed. The management and ownership of the joint venture was controlled in part by provisions of the Shareholder Agreement concerning corporate governance (article 9) and restrictions on transfers of the stock (article 10). Siemens Aktiengesellschaft and Allis-Chalmers became the only two holders of common stock of Siemens-Allis, Inc.

The joint venture acquired a business when assets of the Allis-Chalmers Electrical Products Group (EPG) were transferred[5] from Allis-Chalmers to Siemen-Allis, Inc., in accordance with a "Transfer Agreement" effective as of January 1, 1978, between Allis-Chalmers and Siemens (Transfer Agreement). As consideration, Allis-Chalmers received 80 shares of common stock of Siemens-Allis, Inc. Siemens Aktiengesellschaft received the right to acquire 20 shares of common stock of Siemens-Allis, Inc. in exchange for cash. Wendell F. Bueche, executive vice-president of the EPG, was asked to become president of the joint venture corporation.

The Transfer Agreement also addressed the extent to which Siemens assumed responsibility for product liability claims arising out of the conduct of the business of the EPG. Specifically, the provisions of subparagraph 2.01C of the Transfer Agreement stated that Siemens shall "assume . . . any and all claims . . . or liabilities of any kind or nature now in existence or hereafter arising from or relating to the conduct of the business of the Electrical Products Group by ALLIS-CHALMERS or its Subsidiaries including *but not limited to* (i) . . . ; (ii) . . . ; (iii) . . . and (iv) . . . ." (Italics added.) Subparagraph 2.01C also contained a proviso stating Siemens "will not be responsible for" specific types of claims or circumstances described in clauses (a) through (d).

In January 1986, after the joint venture had operated approximately eight years, a Siemens Aktiengesellschaft entity purchased Allis-Chalmers's ownership interest in the joint venture corporation. (*Fireman's Fund Ins. v. Siemens Energy Automation* (S.D.N.Y. 1996) 948 F.Supp. 1227, 1229, fn. 3 [relying on a deposition of Linda U. Feuss] (*Fireman's Fund v. Siemens*).) On January 31, 1986, the name of the joint venture corporation was changed

---

[5]To avoid wrongly implying Allis-Chalmers was paid cash for its assets, we refer to the transaction involving the exchange of assets for stock as a "transfer" and not a "sale."

from "Siemens-Allis, Inc." to "Siemens Energy & Automation, Inc." This purchase of the stock owned by Allis-Chalmers occurred about 17 months before Allis-Chalmers and 17 affiliated entities filed for chapter 11 bankruptcy on June 29, 1987. The record on appeal does not reflect the economic impact on Allis-Chalmers of the transfer of the assets of the EPG. Defendants have not shown what consideration Allis-Chalmers received for the stock or the amount of cash generated by the joint venture and paid to Allis-Chalmers from the date of transfer of the assets until the sale of its ownership interest in 1986.

After Allis-Chalmers's bankruptcy filing, the "First Amended and Restated Plan of Reorganization of Allis-Chalmers Corporation," was confirmed by the bankruptcy court on October 31, 1988, and created the Allis Trust. Although a copy of the confirmed plan is not contained in the record on appeal, the declaration of Margaret B. Bruemmer, trustee of the Allis Trust, stated that the Allis "Trust was created to provide for an orderly disposition of existing and future product liability claims arising out of the operations of Allis-Chalmers." However, the orderliness of this disposition is subject to question. The court in *Fireman's Fund v. Siemens, supra*, 948 F.Supp. at page 1230 stated, "The Plan's treatment of present and future product liability claims left a number of potential issues unresolved." Whether Fisher's claim would be affected by any of those potential issues cannot be determined on the record before us. Also, the record does not contain any information regarding how many cents on the dollar, if any, are being paid under the confirmed plan on product liability claims.

In support of its motion for summary judgment, Siemens claims it "did not use or exploit the name 'Allis-Chalmers' in connection with its products." Fisher asserts the joint venture corporation exploited the name "Allis" at least until its name was changed from "Siemens-Allis, Inc." to "Siemens Energy & Automation, Inc."

Siemens also asserts it did not continue the Allis-Chalmers product line of type AFR Regulators and that Allis-Chalmers discontinued this specific product line six years prior to the transfer of the EPG assets to Siemens. In contrast, the declaration of Gary Barton, a maintenance supervisor with PG&E, states "[r]egulators of the same type as this regulator are currently being manufactured by Siemens and are virtually identical except for some minor items unrelated to [the] facts and circumstances surrounding this accident." The Barton declaration also asserts Siemens has continued to use the design of the AFR Regulator.

B. *Potential Successor in Interest Liability*

■ The general rule of successor nonliability provides that where a corporation purchases, or otherwise acquires by transfer, the assets of another corporation, the acquiring corporation does not assume the selling corporation's debts and liabilities. (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28 [136 Cal.Rptr. 574, 560 P.2d 3] (*Ray v. Alad*).) This general rule does not apply if "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Ibid.*) A fifth exception to the general rule of successor nonliability was created by the Supreme Court in *Ray v. Alad, supra,* 19 Cal.3d 22, and has become known as the "product line successor" rule because, in certain limited situations, a person injured by the predecessor's product is given a remedy against the successor corporation. (See *Chaknova v. Wilbur-Ellis Co.* (1999) 69 Cal.App.4th 962, 969 [81 Cal.Rptr.2d 871].)

To establish that it is entitled to summary judgment, Siemens must show the exceptions that create successor liability do not apply in this case. Those issues are "extremely fact sensitive." (O'Neill, *Advanced Issues in Strategic Alliances* (2000) 1193 PLI/Corp. 351, 391 [discusses the joint venture's liability for venturer A's obligations prior to the joint venture's acquisition of venturer A's business].) Eliminating the exceptions requires disproving at least one element of each exception or showing that at least one such element cannot be established. (See *Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 100 [93 Cal.Rptr.2d 820].)

1. *Siemens's agreement to assume Allis-Chalmers's tort liabilities*

■ There is no legitimate dispute that Siemens agreed to assume some of the product liability claims against Allis-Chalmers arising from the business of the EPG. In this case, the issue is whether the contractual assumption includes Fisher's product liability claims. The extent of Siemens's contractual assumption raises questions involving the interpretation of the Transfer Agreement. These questions are not unique because the interpretation of the Transfer Agreement as it relates to product liability claims was addressed in a published decision of the United States District

Court for the Southern District of New York.[6] (*Fireman's Fund v. Siemens, supra*, 948 F.Supp. 1227.) Defendants and Fisher failed to cite this case.

In *Fireman's Fund v. Siemens*, the court held Siemens agreed to be responsible for the settlement, costs and expenses of the two product liability cases arising from the business of the EPG; Siemens's liability was $1,409,484.56. Also, in *FFIC and Allis v. Siemens*, Allis-Chalmers and its insurance company sued Siemens to recover costs incurred by them in defending and settling two products liability cases brought against Allis-Chalmers. The claim of the insurance company and Allis-Chalmers was based upon indemnification language contained in both the Transfer Agreement and the Settlement Agreement. The same language in the Transfer Agreement is relevant in this case because Siemens agreed to "assume" the same liabilities that it agreed to indemnify Allis-Chalmers against. (*Fireman's Fund v. Siemens, supra*, 948 F.Supp. at p. 1229 [quoting portions of subpar. 2.01C].).

The provisions of subparagraph 2.01C of the Transfer Agreement at issue in this case, as well as in *Fireman's Fund v. Siemens*, provide that Siemens shall "assume . . . any and all claims . . . or liabilities of any kind or nature now in existence or hereafter arising from or relating to the conduct of the business of the Electrical Products Group by ALLIS-CHALMERS or its Subsidiaries including *but not limited to* (i) . . . ; (ii) . . . ; (iii) . . . and (iv) . . . ." (Italics added.)

The foregoing provisions of subparagraph 2.01C of the Transfer Agreement are not ambiguous on their face. The phrases "any and all" and "of any kind or nature" do not exclude Fisher's theory of product liability from Siemens's assumption. Fisher's lawsuit clearly presents a "claim." That claim arose after the January 1, 1978, effective date of the Transfer Agreement and it arose from or related to "the conduct of the [EPG] by ALLIS-CHALMERS." Furthermore, a literal interpretation of the phrase "including but not limited to" as it relates to clauses (i) through (iv) means those provisions do not limit the general language of assumption contained in subparagraph 2.01C. Consequently, under a literal reading of subparagraph 2.01C, Siemens agreed to assume the liability represented by the Fisher lawsuit.

Siemens's "Amended and Augmented Separate Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment"

---

[6]Although not made part of the record in the present case, a settlement agreement between Allis-Chalmers and Siemens concluded in June 1989 and approved by the judge in the Allis-Chalmers's bankruptcy proceedings on August 15, 1989 (Settlement Agreement), also addressed Siemens's responsibility for product liability claims arising out of the conduct of the business of the EPG. (See *Fireman's Fund v. Siemens, supra*, 948 F.Supp. at pp. 1230-1231.)

(1) did not address this literal reading of the assumption language in subparagraph 2.01C of the Transfer Agreement; (2) did not attempt to show the assumption language was actually ambiguous; and (3) did not address the next step of setting forth uncontradicted extrinsic evidence showing the "ambiguous" assumption language could only be construed to mean the parties did not intend for Siemens to assume the liability represented by the Fisher products liability claim. Therefore, Siemens was not entitled to summary judgment because it failed to establish its agreement to assume liabilities excluded the Fisher products liability claim.

Siemens did address Fisher's assertion that Siemens contractually assumed the liability represented by her product liability claim in its appellate brief, but gave it short shrift. Siemens's appellate brief stated, "in her effort to create a triable issue of material fact, Fisher attempts to pick and choose among certain so-called indemnity provisions of the transfer agreement relating to the joint venture." Siemens's only argument supporting this statement is that the creation of the Allis Trust "clearly establishes that, in fact, there was no intent by the parties to the joint venture transfer agreement that Siemens Energy would assume any liability for discontinued products, especially those it never manufactured." Siemens infers this conclusion regarding mutual intent from the assertion that if such an intent existed, there would have been no need to create the Allis Trust. While the creation of the Allis Trust over 10 years after Allis-Chalmers and Siemens signed the Transfer Agreement may shed some light on the mutual intention expressed in the Transfer Agreement, Siemens's logic is fatally flawed because there is no evidence that the Allis Trust only handled product liability claims related to the business of the EPG. Reported cases show the breadth of claims handled by the Allis Trust goes beyond those claims arising from the conduct of the business of the EPG. (See, e.g., *Moore v. Cardinal Packaging Inc.* (2000) 136 Ohio App.3d 101, 103, fn. 2 [735 N.E.2d 990, 992] [the Allis Trust is a defendant in litigation related to a forklift manufactured by Allis-Chalmers].) Accordingly, the creation of the Allis Trust had an obvious purpose even if all claims relating to the EPG were assumed by Siemens.

Defense counsel's cursory response to Fisher's argument that Siemens contractually assumed the liability represented by her claim and the weakness of their inference about the mutual intent of Siemens and Allis-Chalmers drawn from the existence of the Allis Trust only elevates the concern raised by defense counsel's failure to refer to published cases interpreting subparagraph 2.01C of the Transfer Agreement. Specifically, Siemens did not mention either *Fireman's Fund v. Siemens, supra,* 948 F.Supp. 1227, or *Strausberg v. Siemens Energy & Automation, Inc.* (S.D.N.Y.

Oct. 20, 1994, No. 93 Civ. 5734) 1994 WL 577008, *affirmed without opinion* (2d Cir. 1995) 54 F.3d 765, cert. denied 516 U.S. 964 (*Strausberg*), to the trial court or in its appellate brief, much less distinguish Fisher's product liability claim from the three product liability claims those cases held were Siemens's responsibility. Whether these omissions were an attempt to mislead the trial judge and this court about the meaning of the Transfer Agreement and whether Fisher's claim is legitimately distinguished from the other three claims are matters we leave to the trial court. (See Bus. & Prof. Code, § 6068, subd. (d); Rules Prof. Conduct, rule 5-200(B); *Ainsworth v. State Bar* (1988) 46 Cal.3d 1218, 1234 [252 Cal.Rptr. 267, 762 P.2d 431, 86 A.L.R.4th 1053] [attorney's wrongful acts included intentionally misleading a judicial officer].) We do note that Linda U. Feuss, inside counsel and the secretary of Siemens whose declaration authenticated the Transfer Agreement, knew of the prior litigation because she was involved in it. That she chose not to inform Haight, Brown & Bonesteel, LLP, about the published cases and that defense counsel's own research failed to uncover the cases, under the current state of the record, strains credulity.

On remand, the literal reading of the assumption language might prevail. Nevertheless, the possibility remains that Siemens may attack the broad assumption language contained in subparagraph 2.01C of the Transfer Agreement by proving one of the exceptions contained in clauses (a) through (d) of subparagraph 2.01C applies to the facts of this case. Also, Siemens might argue that the language of subparagraph 2.01C is ambiguous and clauses (i) through (iv) were in fact intended to limit the scope of the broad assumption language in a manner relevant to this case. If extrinsic evidence is offered to support this view, its *admissibility* is an issue to be determined on remand.

Clauses (a) through (d) of subparagraph 2.01C of the Transfer Agreement set forth the specific type of claims or circumstances that Siemens "will not be responsible for." These clauses, unlike clauses (i) through (iv), expressly restrict the extent to which, under subparagraph 2.01C, Siemens assumed "any and all claims . . . or liabilities of any kind or nature now in existence or hereafter arising from or relating to the conduct of the business of the Electrical Products Group by ALLIS-CHALMERS or its Subsidiaries . . . ." None of these clauses appear to apply based on the record on appeal. Clause (a) excludes certain claims relating to transformers. Because the item of equipment involved in the accident in this case was a regulator, it appears clause (a) does not apply. Clause (b) excludes accidents arising before January 1, 1978, that are covered by insurance. Clause (c) excludes claims arising out of the collections of receivables. Clause (d) excludes amounts

exceeding a formula, one element of which is certain of Siemens's expenditures within five years of the closing date. The existence of these exceptions show the drafters knew how to exclude matters from the assumption and indemnification language, which strengthens the view that the drafters intended the phrase "including but not limited to" to mean what it says.

On remand, to show the assumption language is ambiguous, Siemens must present parol evidence regarding the meaning of the provisions of subparagraph 2.01C of the Transfer Agreement. (See *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165-1166 [6 Cal.Rptr.2d 554] [setting forth the two-step process used to decide whether to *admit* parol evidence].) Credible parol evidence of the intent of the parties to the Transfer Agreement concerning the scope of Siemens's assumption of liability may exist within the pleadings filed and the transcripts of depositions taken in *Fireman's Fund v. Siemens, supra*, 948 F.Supp. 1227, and *Strausberg, supra*, 1994 WL 577008, because in those cases Allis Trust and Siemens were in conflict over the meaning of their agreements defining Siemens's responsibilities.

We observe that extrinsic evidence exists that conflicts with the interpretation of the Transfer Agreement Siemens has advocated in this case. For example, in *Fireman's Fund v. Siemens, supra*, 948 F.Supp. at pages 1230 and 1234, Siemens took the position that it agreed to responsibility for class 8 claims, i.e., claims that included "product liability claims arising from events or occurrences on or after January 1, 1986." In its statement of undisputed facts filed in this case, Siemens states claims such as Fisher's "are treated as Class 8 general unsecured creditors in the Allis-Chalmers Bankruptcy." Accordingly, Siemens's 1996 statement that it agreed to responsibility for class 8 claims supports the interpretation it assumed the liability represented by Fisher's claim.

Parol evidence of "subsequent acts and conduct of the parties" may be relevant to contract interpretation because it manifests the mutual intention of the parties about how their contract should be applied. (See *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473-474 [80 Cal.Rptr.2d 329].) Consequently, evidence of other product liability cases in which Siemens did, or did not, assume or indemnify Allis-Chalmers or Allis Trust would be relevant, as well as any oral or written agreement or understanding in the present case regarding defendants' respective responsibilities for liability to the plaintiff and the costs, expenses and attorney fees related to defense. Some such cases may be included in the list of pending cases Linda Feuss provided to Allis-Chalmers on August 22, 1989. (See *Fireman's Fund v. Siemens, supra*, 948 F.Supp. at p. 1231.)

In summary, the record currently shows that Siemens agreed to assume the liabilities arising from or relating to the conduct of the business of the EPG and does not show that the claim of Fisher is excluded from the assumption.[7]

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## Disposition

The December 6, 1999, judgment in favor of Siemens is reversed; the trial court is directed to vacate the December 3, 1999, order granting the motions for summary judgment of defendants and enter a new order denying the motions. We reinstate the trial court's orders vacating the finding that the requests for admission be deemed admitted and vacating the December 6, 1999, judgment in favor of Allis. The matter is remanded to the trial court for further proceedings consistent with this opinion. Fisher is awarded costs on appeal.

Dibiaso, Acting P. J., and Cornell, J., concurred.

A petition for a rehearing was denied February 25, 2002, and the petition of defendants and appellants for review by the Supreme Court was denied May 15, 2002. Chin, J., did not participate therein.

---

[7]Whether Siemens could avoid liability by transferring some of the responsibilities it assumed to the Allis Trust is a question we need not address.

*See footnote, *ante*, page 1182.