[No. B175530. Second Dist., Div. One. Aug. 30, 2006.]

NORA ARMENTA ex rel. CITY OF BURBANK et al., Plaintiffs and Appellants, v.
MUELLER CO. et al., Defendants and Respondents.

## COUNSEL

Irell & Manella, Gregory R. Smith, S. Thomas Pollack, Mark Paluch; Phillips & Cohen, Eric R. Havian and Harry Litman for Plaintiffs and Appellants.

Beck, DeCorso, Daly, Kreindler & Harris, Bryan D. Daly, Charles L. Kreindler, Barbara E. Taylor; Stanzler, Funderburk & Castellon and Ruben A. Castellon for Defendants and Respondents Mueller Co. and Tyco International (US) Inc.

Weston, Benshoof, Rochefort, Rubalcava & MacCuish, David S. MacCuish, Kurt V. Osenbaugh and Andrew M. Gilford for Defendant and Respondent Watts Industries, Inc.

## OPINION

**SPENCER, P. J.—**

### INTRODUCTION

Qui tam[1] plaintiff Nora Armenta (Armenta), the City of Burbank, the City of Pomona and the Alameda County Water District appeal from summary judgments entered in favor of defendants Mueller Co. (Mueller) and Tyco International (US) Inc. (Tyco). Armenta challenges the propriety of revoking the court's grant of leave to file her second amended complaint, arguing that the trial court abused its discretion in imposing and enforcing an unfair condition upon Armenta's ability to file her second amended complaint, which alleges the violation of the California False Claims Act (CFCA) (Gov.

---

[1] As we explained in our earlier opinion, *City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 797, footnote 1 [107 Cal.Rptr.2d 710], " '*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means "who pursues this action on our Lord the King's behalf as well as his own." ' [Citation.]"

Code, § 12650 et seq.)[2] with respect to an additional 130 governmental entities. All of the plaintiffs attack the summary judgments, contending that they raised triable issues of material fact regarding Mueller's and Tyco's liability for violation of the CFCA.

We agree that the trial court abused its discretion in conditioning leave to amend and that the abuse requires reversal of the subsequent order partially revoking the court's grant of leave to amend. We further agree that the summary judgments must be reversed, in that triable issues of fact exist as to Mueller's and Tyco's liability.

### FACTUAL BACKGROUND[3]

James Jones Company (Jones) and its parent companies, Mueller, Tyco and Watts Industries, Inc. (Watts), "manufacture and supply pipes and other water distribution parts." They sell these parts "directly to municipalities for carrying drinking water or to contractors for eventual use in municipal water systems." (*City of Pomona v. Superior Court, supra,* 89 Cal.App.4th at p. 797.) Each of the governmental entities named in the second amended complaint requires that vendors provide water system components fabricated of bronze which conform to or exceed the standards of the American Water Works Association (AWWA). (Second amended complaint, pars. 14, 70.)

Jones's catalogues and sales literature represented that all of the pipes, valves, ball valves, stops and fittings which it offered for sale did conform to AWWA standards. "AWWA Standard C-800-89" requires that all bronze parts coming into contact with drinking water "contain 85 percent copper and 5 percent each of tin, lead and zinc," a mix commonly known as 85 metal. (*City of Pomona v. Superior Court, supra,* 89 Cal.App.4th at pp. 797–798.) Those parts include valves, which control the flow of water from the main water line to a residence; balls, the component of a valve which either blocks or permits the flow of water through the valve; saddles; and compression nuts. (Second amended complaint, par. 14.) "AWWA imposes this standard '[b]ecause of the potential for corrosion of high-zinc brasses.' " (*City of Pomona, supra,* at p. 797.)

---

[2] Unless otherwise specified, all section references hereinafter are to the Government Code.

[3] To provide context, we take our "facts" from the allegations of the first amended complaint, which we addressed in *City of Pomona v. Superior Court, supra,* 89 Cal.App.4th 793, as well as from those of the second amended complaint. We rely on *City of Pomona* to the extent possible because many allegations of the first and second amended complaints are nearly identical, and we already undertook the task of summarizing those allegations in *City of Pomona.* Additional allegations and facts will appear as they become necessary to the resolution of the issues raised on appeal.

Jones's catalogues and sales literature emphasize the value of 85 metal in resisting corrosion. They represent that "Jones's products are made of 85 metal 'for long, long, life,' 'to insure long life in the harshest soils,' or 'for corrosion protection.' " (*City of Pomona v. Superior Court, supra,* 89 Cal.App.4th at p. 798.) "These statements are patently false." (Second amended complaint, par. 15.)

Jones circulated to all potential customers, including governmental entities, and to distributors through whom Jones sold its products, catalogues offering its parts for sale. It did so with the expectation that Jones's potential customers would refer to, and rely upon, the catalogues when they ordered parts to be used in water distribution. (*City of Pomona v. Superior Court, supra,* 89 Cal.App.4th at p. 798.) It is Armenta's information and belief that during the 10 years preceding 1998, Jones disseminated its false catalogue statements to each California political subdivision which purchased, directly or through distributors, Jones parts coming into contact with drinking water. (Second amended complaint, pars. 6, 65.)

In August 1991, Jones's president instructed Armenta, who then was Jones's purchasing manager, to purchase "raw metal with less copper and more lead or zinc. Jones manufactured, and sold pipes and valves using 81 metal [comprised of 81 percent copper, 9 percent zinc, 3 percent tin and 7 percent lead] rather than 85 metal as it continued to represent in its catalogues and sales materials that the pipes and other parts either complied with AWWA standards or were made of 85 metal. Jones also manufactured or purchased from suppliers certain sizes of balls for valves made from 360 metal [comprised of 60 percent copper and 40 percent zinc, which corrodes approximately five times faster than 85 metal] while continuing to represent that these parts were made of 85 metal." (*City of Pomona v. Superior Court, supra,* 89 Cal.App.4th at p. 799; second amended complaint, pars. 20, 22, 23.)

Armenta expressed concerns about the balls' zinc content repeatedly. On each occasion, however, Jones's employees told her it was not a matter about which she should be concerned.

Jones shipped to California customers valve balls that were made of 81 metal. It falsely certified to its customers that these valve balls were made of 85 metal. Jones shipped many other 81 metal parts to California governmental entities, knowing that AWWA standards required them to be made of 85 metal, and representing that they were. These parts included thousands of

saddles. Each shipment invoice consequently presented a false claim.

Jones acquires the many parts comprising the finished products it sells to its waterworks customers in two ways: through manufacture or through purchase. "It purchased parts from its suppliers knowing that those parts were made of substandard metal, and it manufactured parts at its foundry from substandard metal." Jones then sold those parts to governmental entities while falsely certifying that they were made of conforming metal.

## DISCUSSION

### 1. *The Appeal Is Timely*

Defendants argue that plaintiff Armenta's appeal is untimely insofar as it challenges the partial denial of her motion to file a second amended complaint, in that the order of denial, as defendants characterize the order partially revoking the court's grant of leave to amend, was appealable when rendered. They are mistaken.

█ A qui tam action differs from other actions. The governmental entity on behalf of which a qui tam plaintiff sues under the CFCA does not become a party to the suit unless and until the entity intervenes in the action. (Cf. *U.S. ex rel. Mayfield v. Lockheed Martin Engin.* (SD.Tex. 2002) 186 F.Supp.2d 711, 714, fn. 1; *U.S. ex rel. Farrell v. SKF, USA, Inc.* (W.D.N.Y. 1999) 32 F.Supp.2d 617, 618.) The qui tam plaintiff does not act solely as a representative for governmental entities which do not intervene, however.

The CFCA authorizes an individual to bring suit for a violation of the act not only on behalf of a defrauded governmental entity but in her own right as well. (§ 12652, subd. (c)(1).) In essence, the act makes a limited, conditional, partial assignment of the governmental entities' cause of action to the qui tam plaintiff, or relator, who brings suit. (*In re Schimmels* (9th Cir. 1997) 127 F.3d 875, 884; see also *Vermont Agency of Natural Resources v. United States ex rel. Stevens* (2000) 529 U.S. 765, 773 [146 L.Ed.2d 836, 120 S.Ct. 1858].) The result is that once a qui tam plaintiff brings suit based on a heretofore unknown governmental fraud, no other person may pursue a related action, i.e., an action on behalf of a different governmental entity, if the facts, or "material elements of fraud," in the related action are the same. (§ 12652, subd. (c)(10); *Grynberg v. Koch Gateway Pipeline Co.* (10th Cir. 2004) 390 F.3d 1276, 1279–1280; *U.S. ex rel. Hampton v. Columbia/HCA Healthcare* (D.C.Cir. 2003) 355 U.S. App.D.C. 23 [318 F.3d 214, 218].)

In short, Armenta has a personal stake in the action beyond her representative stake. It is not only the governmental entities on behalf of which she sues who will recover damages but Armenta as well. (§ 12652, subd. (g)(2), (3).) The order partially revoking the court's grant of Armenta's motion for leave to file her second amended complaint therefore did not resolve all causes of action between Armenta and defendants, and was not appealable when rendered. (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743 [29 Cal.Rptr.2d 804, 872 P.2d 143].) Inasmuch as the summary judgments entered in favor of Mueller and Tyco dispose of all claims against them, however, we may consider the propriety of the revocation order upon review of the judgments.

### 2. The Trial Court Abused Its Discretion in Revoking Armenta's Leave to File Her Second Amended Complaint

The trial court initially granted Armenta's motion for leave to amend her complaint conditioned upon the 130 newly named governmental entities responding to discovery propounded by defendants. When 47 of these entities either failed or refused to respond to the discovery demand, defendants moved the court to revoke leave to amend as to those 47 entities only. The trial court granted defendants' motion.

The trial court has discretion to permit or deny the amendment of the complaint, but instances justifying the court's denial of leave to amend are rare. (*Mabie v. Hyatt* (1998) 61 Cal.App.4th 581, 596 [71 Cal.Rptr.2d 657].) Similarly, the court's discretion to impose conditions on leave to amend the complaint extends only to those conditions which are just, i.e., intended to compensate the defendants for any inconvenience belated amendment may cause. (*Williams v. Myer* (1907) 150 Cal. 714, 718 [89 P. 972].) Defendants have not cited authority, and we have discovered none, for the proposition that the court may condition amendment upon the newly named entities' compliance with court-ordered discovery.

The purpose of the discovery, purportedly, was to provide information that was missing from the second amended complaint. The trial court conditioned amendment on "foundational discovery . . . in lieu of specificity." The discovery propounded, however, went far beyond providing "foundational" information. It demanded the identity of every Jones waterworks part each governmental entity had purchased, whether that entity purchased it directly from Jones or from a Jones distributor, the date upon which each entity purchased each part, the locations at which each entity had installed each part, the dates and results of any metal composition tests conducted by each entity, the identity of all governmental employees to whom Jones made representations, what investigations the entities had conducted into lead

leaching or premature corrosion, when and how the entities discovered each false claim, and much more.

This is substantially more information than that provided in the first amended complaint, which was a sufficient pleading (*City of Pomona v. Superior Court, supra,* 89 Cal.App.4th at pp. 803–805) with respect to the entities named in it. In short, the court-ordered discovery far exceeded that which would have been necessary to provide the defendants with proper notice of the newly named entities' claims.

Moreover, had the second amended complaint clearly lacked the requisite specificity, the appropriate remedy would have been for the court to deny leave to amend from the outset rather than to condition amendment upon the newly named entities' "filling in the blanks." (Cf., e.g., *Yuhasz v. Brush Wellman, Inc.* (6th Cir. 2003) 341 F.3d 559, 566; *Rutman Wine Co. v. E. & J. Gallo Winery* (9th Cir. 1987) 829 F.2d 729, 738.) If, in contrast, the adequacy of the pleading was merely unclear, the proper course of action would have been to permit amendment, after which defendants could have tested the complaint's sufficiency via demurrer or motion for judgment on the pleadings. (*California Casualty Gen. Ins. Co. v. Superior Court* (1985) 173 Cal.App.3d 274, 281 [218 Cal.Rptr. 817].)

Defendants argue, however, that the discovery condition was just because their ability to conduct discovery might have been curtailed due to the "phasing" of the case, while they were "subjected to the negative business ramifications of unsubstantiated allegations," and because it would have been "cumbersome and time consuming . . . for the parties to issue 130 subpoenas for documents and take 130 depositions." The arguments are invalid.

First, if there were any true danger that defendants would not be able to conduct adequate discovery after they tested the second amended complaint's sufficiency via demurrer or some other means, if they wished, and answered it, then the court could have adjusted the "phasing" of the case, or it could have required Armenta to identify already discovered documents, as well as the contents of any interviews conducted, upon which she relied in deciding to add these entities to the action. This would have permitted defendants to narrow the scope of the necessary discovery significantly. In fact, Armenta had done exactly that when she provided her personal discovery responses, which defendants had *before* they fashioned the discovery demand aimed at the newly named entities.[4]

---

[4] Qui tam plaintiff identified by Bates stamp numbers and, where appropriate, vendor initials each document already produced through discovery upon which she relied and offered to make

Second, any "negative business ramifications" existed with or without the filing of the second amended complaint. Defendants would have faced the first amended complaint's detailed recitation of hundreds of fraudulent statements and false government claims. Those allegations, too, were largely untested when Armenta sought leave to file the second amended complaint.

Third, issuing 130 subpoenas and taking 130 depositions necessarily is cumbersome and time consuming whatever the circumstances. It is no more so because Armenta sought to add 130 governmental entities by amendment than it would have been had she named them earlier.

In short, conditioning amendment upon each entity responding to an extraordinarily detailed discovery demand was an unjust condition. The trial court abused its discretion in imposing it.

The trial court stated, as an alternative reason for revoking leave to amend with respect to the 47 nonresponding newly named governmental entities, that the second amended complaint lacked adequate particularity. It does not.

Like the first amended complaint, the very lengthy second amended complaint, which includes its dozens of incorporated exhibits, is thick with detail concerning Jones's fraudulent scheme, the manner in which Jones conveyed all representations to all governmental waterworks customers, the specific manner in which the representations concerning all Jones parts were false, Jones's knowledge of that falsity and its intent that all governmental customers rely on the false representations. (See Factual Background, *ante*.) It also details the manner in which Watts, Mueller and Tyco are responsible for Jones's fraudulent acts and identifies many of the employees involved. (Second amended complaint, pars. 71–118.)

While the second amended complaint does not specify, with respect to the newly named governmental entities, the dates upon which they contracted to purchase Jones waterworks parts, the manner in which they received Jones's false representations and the invoices evidencing Jones's false claims, it does detail this information with respect to other real parties in interest. In addition, the second amended complaint alleges that each of the real parties in interest purchased Jones waterworks parts during the requisite time period either directly from Jones or from Jones's distributors, that Jones knowingly made the same false representations to each of them, and that Jones filed the same variety of false claims with each of them. (See Factual Background, *ante*; second amended complaint, pars. 56–70.)

available for review any documents defendants did not already possess. She also summarized nonprivileged information she had received in informal interviews with the newly named entities.

This is enough. It identifies every false representation (specific metal-composition catalogue or sales literature assertions, or invoices averring the parts described conform to metal-composition contractual specifications) and every contract at issue (each purchase of Jones waterworks parts made of substandard metal). It also states when (within the specified 10-year period), where (at the entities' or Jones's distributors' premises) and how (via catalogue, sales literature, or invoice purporting to comply with contract specifications) Jones made the false statements to the governmental entities. (*U.S. ex rel. Lee v. SmithKline Beecham,* Inc. (9th Cir. 2001) 245 F.3d 1048, 1051, citing *Cooper v. Pickett* (9th Cir. 1997) 137 F.3d 616, 627; *United States ex rel. Roby v. Boeing Co.* (S.D.Ohio 1998) 184 F.R.D. 107, 108, 109–110; accord, *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 217–218 [197 Cal.Rptr. 783, 673 P.2d 660].) The particularity with which the second amended complaint notifies defendants of the nature of their liability with respect to each of the newly named governmental entities emphasizes the unjustness of conditioning the amendment on the entities' responses to extraordinarily detailed discovery demands.

To summarize, the trial court abused its discretion when it unreasonably and unjustly conditioned its order granting Armenta's motion for leave to file the second amended complaint, and when it concluded that the complaint lacked sufficient particularity. Necessarily, then, the court improperly revoked its grant of leave with respect to 47 governmental entities. The order of revocation must be reversed, and the second amended complaint must be reinstated with regard to those entities.

3. *There Is a Triable Issue of Material Fact as to Whether Defendants Mueller and Tyco May Be Held Liable as Passive Beneficiaries*

In opposing defendants Mueller's and Tyco's motions for summary judgment, plaintiffs argued that Mueller and Tyco were directly liable on two separate bases: (1) they were the knowing beneficiaries of Jones's false claim presentations, and (2) they aided and abetted Jones's presentation of false claims. In response, defendants Mueller and Tyco argued, among other things, that section 12651, subdivision (a)(8),[5] does not impose liability on passive beneficiaries of false claims regardless of their knowledge, and that neither subdivision (a)(1) nor (2) of section 12651 imposes aider and abettor liability. We conclude that there are triable issues of material fact as to whether Mueller and Tyco are beneficiaries of a false claim submitted by

---

[5] Section 12651, subdivision (a)(8), provides that one may be liable under the CFCA if he or she "[i]s a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim."

Jones within the meaning of section 12651, subdivision (a)(8), and reverse the summary judgments on that basis.[6]

After Mueller became Jones's parent company in 1996, Mueller performed sample testing and learned that Jones's bronze parts which came into contact with potable water "sometimes" were made of inferior metal rather than the 85-5-5-5 metal required by the AWWA standards. At some point, Jones's own testing showed that roughly 30 percent of the bronze parts which would be in contact with drinking water did not conform to AWWA standards. A report comparing Jones's products to those of a competitor noted, with respect to a valve assembly: "The key and the nut are 85-5-5-5 material. The body and the remainder of the material has been identified as 81 brass. **(This is a concern.)**" In addition, a Jones employee informed Mueller that it was Jones's practice to make "trim" of 81 metal, an inferior form of bronze, although the employee also stated that she now would obtain price quotations for the manufacture of "trim" from 85 metal.

A January 20, 1997 Mueller memorandum "concerning the material and design issues associated with . . . Jones product" suggests that Mueller act only as a clearinghouse for the product but not certify it. Jones would certify the product and address any customer complaints. The memorandum concluded: "This is how I think we can handle this issue without getting our facility involved and basically protecting our Engineering and Quality concerns along with our reputation." A memorandum dated February 11, 1997, from a Mueller employee to its president noted: "Jones appears to have little control over grade of brass being used. Consistently they do not use 8-5-5-5 [sic] in nuts and washers, it is almost always 81-3-7-9. Parts in contact with potable water sometimes are 81-3-7-9 (81% copper, 3% tin, 7% lead and 9% zinc.) AWWA C800 requires 85-5-5-5."

From the foregoing evidence, a jury could conclude that Mueller was aware that Jones was selling below standard pipes and other water distribution parts to California municipalities. There thus is a triable issue of material fact as to whether Mueller had the knowledge required to impose liability on it as a passive beneficiary.

---

[6] Watts owned all of Jones's stock from 1986 to September 1996. In September 1996, Mueller, which was a Tyco subsidiary, acquired Jones from Watts. Inasmuch as plaintiffs allege that the false representations as to the metal used in Jones parts continued into 1998, Tyco and Mueller have potential liability for wrongs committed after their acquisition of Jones, though they may not be held liable as a successor for wrongs committed previously. (*Fisher v. Allis-Chalmers Corp. Product Liability Trust* (2002) 95 Cal.App.4th 1182, 1188 [116 Cal.Rptr.2d 310].)

Ken Davis, Jones's general manager and vice-president, was affiliated with Mueller. All of Jones's directors also were directors of Mueller, while half of them were directors of Tyco. Of Jones's 11 officers, only two were not officers of Tyco, Mueller, or another Tyco subsidiary. Jones's president also was Mueller's president, who reported to Tyco executive Bob Mead. An officer of Mueller, who was also an officer of Tyco, confirmed in office the current slate of Jones's officers and directors in lieu of holding an annual meeting. Further, Jones paid only two of its officers, Ken Davis and Cindy Dykstra, while Mueller or Tyco paid the others. Jones had to obtain Mueller's approval for expenditures exceeding $1,726 and Tyco's approval for capital expenditures. Tyco's chief operating officer was also a Jones officer.

The foregoing creates a triable issue of material fact as to whether Mueller and Tyco had knowledge that Jones was selling substandard pipes and other water distribution parts to municipalities in California. Jones knew what it was doing, Mueller found out and Jones's officers, who were also Tyco's officers, brought that knowledge to Tyco. In simple words, the right hand (Mueller and Tyco) knew what the left hand (Jones) was doing. With that knowledge, Mueller and Tyco would be beneficiaries of Jones's alleged perfidy under section 12651, subdivision (a)(8).

■ Contrary to the position taken by the dissent, liability may be imposed under section 12651, subdivision (a)(8), on third persons who did not submit the false claims themselves. The federal cases cited are inapposite, in that the federal statute has no counterpart to subdivision (a)(8) of section 12651. The federal counterpart, title 31 United States Code section 3729(a), stops at paragraph (7); it has no paragraph (8) comparable to subdivision (a)(8) of section 12651. Interpretation of the federal statute thus has no bearing on interpretation of section 12651, subdivision (a)(8). (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 121 [65 Cal.Rptr.2d 580, 939 P.2d 1280]; see also *Heating Equipment Mfg. Co. v. Franchise Tax Board* (1964) 228 Cal.App.2d 290, 310, fn. 15 [39 Cal.Rptr. 453].)

■ Additionally, the language of subdivision (a)(8) of section 12651 does not compel a conclusion that the beneficiary must be the one who inadvertently submitted the false claim. By referring to "*a* beneficiary of *an* inadvertent submission of a false claim," the statute does not require that the beneficiary have submitted the false claim. (*Ibid.*, italics added.) Had the Legislature intended the statute to be so limited, the Legislature could have specified this to be a requirement, such as by providing that the subdivision applies to "one who inadvertently submits a false claim and benefits thereby." (See *Chavez v. Sargent* (1959) 52 Cal.2d 162, 205 [339 P.2d 801] [it

must be presumed the words in a statute were "used intelligently and designedly and for an express purpose by the Legislature"].) "Since the Legislature did not impose any limitation, it would be improper for this court to add words to limit or change the plain meaning of the statute." (*Southern Cal. Edison Co. v. Public Utilities Com.* (2002) 101 Cal.App.4th 982, 994 [125 Cal.Rptr.2d 211].)

The legislative history of the statute (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]) supports the conclusion that subdivision (a)(8) of section 12651 applies to third party beneficiaries of false claims. The Assembly Committee on the Judiciary comment on Assembly Bill No. 1441 (1987–1988 Reg. Sess.), as amended April 29, 1987, states at page 4 that "[a] beneficiary under these circumstances *has not made* a false claim to the state o[r] political subdivision. Should such beneficiary be subjected to the same civil penalties and punitive damages as the person who knowingly submits such claim with intent to defraud?" (Italics added; see also Assem. 3d reading com. on Assem. Bill No. 1441 (1987–1988 Reg. Sess.) as amended May 18, 1987, p. 3 ["Should there not be a reasonable period of time within which a beneficiary of an inadvertent submission of a false claim could report or correct the false claim prior to becoming liable? Should such beneficiary, *who has not made the false claim*, be subjected to the same civil penalties and punitive damages as the person who knowingly submits such claim with intent to defraud?" (Italics added.)])

Moreover, that section 12651, subdivision (a)(8), refers to the "inadvertent submission of a false claim" does not preclude the imposition of liability on the beneficiary of a false claim where the claim has been submitted intentionally. The legislative history of the section evidences an intent to impose liability on beneficiaries of false claims, whether the submission of the claims was intentional or inadvertent. In an analysis of the CFCA prepared by the Center for Law in the Public Interest, the sponsor of the bill (Senate Com. on Judiciary, Background Information on Assem. Bill No. 1441 (1987–1988 Reg. Sess.); Assem. Ways and Means Com., Republican Analysis of Assem. Bill No. 1441 (1987–1988 Reg. Sess.) Jun. 8, 1987), it was explained that "[p]aragraph (a)(8) is intended to reach situations where a person benefits from grossly negligent or inattentive business practices with the government by the inadvertent submission of a false claim or claims. Inadvertent submissions of false claims which are subsequently discovered by the beneficiary of such a claim and not disclosed to the State or a political subdivision prior to the filing of an action . . . *will be treated the same as an intentionally submitted false claim.*" (Section-by-Section Analysis of Draft Prepared by Center for Law in the Public Interest, p. 9, italics added; Senate Com. on Judiciary, Rep. on Assem. Bill No. 1441 (1987–1988 Reg. Sess.) as amended July 9, 1987, p. 5.) It would be absurd to impose liability on the beneficiary

of an inadvertently submitted false claim, while allowing the beneficiary of an intentionally submitted false claim to avoid liability. (*Verreos v. City and County of San Francisco* (1976) 63 Cal.App.3d 86, 96 [133 Cal.Rptr. 649] [the court must give the statute a reasonable interpretation, avoiding a literal interpretation which will lead to an absurd result].)[7]

In summary, there is a triable issue of fact as to whether Mueller and Tyco may be held liable under section 12651, subdivision (a)(8), as the beneficiaries of Jones's submission of false claims. Accordingly, the trial court erred in granting summary judgment as to them.[8]

## DISPOSITION

The order partially revoking the grant of leave to file a second amended complaint is reversed, and the second amended complaint is reinstated with respect to the 47 entities that were the object of the revocation order. The summary judgments are reversed. Plaintiffs are to recover costs on appeal.

Mallano, J., concurred.

**VOGEL, J.**—I agree that the appeal is timely, and agree that the order revoking Armenta's leave to file her second amended complaint should be reversed, but I disagree with the majority's unsupported conclusion that, on these facts, a parent, grandparent, or great-grandparent corporation can be liable for its subsidiary's alleged violations of the False Claims Act.

### A.

James Jones Company, which manufactures and sells waterworks parts for use in municipal drinking water systems, represented in its catalogues and sales literature that all of its products complied with American Water Works Association (AWWA) standards. Under AWWA standard C-800-89, all materials in contact with potable water must be "85 metal" (meaning the materials must contain 85 percent copper and 5 percent each of tin, lead, and zinc).

Nora Armenta was Jones's purchasing manager. In August 1991, Jones's president allegedly directed Armenta to purchase raw metal with less copper and more lead and zinc. Although Jones continued to represent in its sales

---

[7] In any event, in their second amended complaint, plaintiffs alternatively pleaded that Mueller and Tyco were "the beneficiaries of the inadvertent submission of false claims" within the meaning of section 12651, subdivision (a)(8).

[8] In light of this conclusion, we need not rule on plaintiffs' contentions that the trial court erred in failing to find a triable issue of fact as to Jones's status as an alter ego of Mueller and Tyco and in failing to rule on their evidentiary objections.

materials that it was using 85 metal, it thereafter allegedly manufactured and sold waterworks using "81 metal" (comprised of 81 percent copper, 9 percent zinc, 3 percent tin, and 7 percent lead). Armenta allegedly expressed concerns about the switch from 85 metal to 81 metal but was rebuffed by her supervisors.

In reliance on Jones's representations in its sales materials, numerous cities and water districts purchased Jones's products.

## B.

In 1997, Armenta initiated this qui tam action on behalf of the State of California, naming Jones and its parent and grandparent corporations, Mueller Co. and Tyco International (US), Inc., as defendants and alleging violations of the False Claims Act (Gov. Code, § 12650 et seq.).[1] Defendants' demurrers were sustained with leave to amend and (in 1998) Armenta filed a first amended complaint in which she added 33 governmental entities as plaintiffs and elaborated on her allegations of fraud. Defendants' demurrers were overruled and their motions to strike denied.

In September 2000, Armenta sought leave to file a second amended complaint. In her proposed first cause of action, Armenta alleged that Jones and its related corporations "knowingly present[ed] and cause[d] to be present[ed]" a false claim, or "knowingly made . . . and caused to be made and used false records" within the meaning of subdivisions (a)(1) and (a)(2) of section 12651. In her second proposed cause of action, she alleged that, in violation of subdivision (a)(8) of section 12651, Jones and its related corporations are liable as beneficiaries of Jones's false claims. Armenta was allowed to file her second amended complaint.[2]

Defendants demurred to all causes of action, contending (among other things) that Armenta had failed to state a cause of action under the False Claims Act. In January 2001, over Armenta's opposition, the demurrers were sustained without leave to amend and those causes of action were dismissed.

---

[1] Subsequent undesignated section references are to the Government Code. The False Claims Act is a whistleblower statute authorizing any person (a "relator") with knowledge of fraud against a California governmental entity to file a qui tam action on behalf of the entity. When the action is filed, the governmental victim of the fraud may intervene and take primary responsibility for prosecution of the action. If the entity does not intervene, the relator has the same right to prosecute the action as the entity would have had if it had intervened. (§ 12652.) Watts Industries, Inc. is also a named defendant and a respondent on this appeal but is not directly involved in the issue addressed by this dissent.

[2] The second amended complaint and the majority opinion treat Tyco and Mueller as a single entity. As explained below, they are separate legal entities and the evidence about Mueller has nothing to do with Tyco.

The City of Pomona, one of the interveners, sought our assistance by way of a petition for a writ of mandate, which we granted in May 2001, at which time we found the pleading sufficient and directed the trial court to overrule the demurrer. (*City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 805 [107 Cal.Rptr.2d 710].)[3]

## C.

In September 2003, Mueller moved for summary judgment, contending that Jones is a separate corporate entity, that Mueller's only relationship with Jones was as its corporate parent (which it became in September 1996 when it acquired all of Jones's stock from Watts), and that Armenta could not establish that Mueller had any liability—either based on its participation in Jones's alleged misconduct or on an alter ego theory. In its accompanying separate statement of undisputed facts and supporting evidence, Mueller established the following facts:

Tyco, a publicly traded holding company, is the parent of hundreds of subsidiaries in diversified manufacturing and service industries around the world. Tyco is the direct parent of Mueller Holdings Corporation, which is the direct parent of Mueller Co., an Illinois corporation that is one of the largest suppliers of flow control products used in distribution systems for municipal potable water and natural gas. From the late 1980's until 1999, Mueller Co. was an indirect subsidiary of Tyco.

Jones employs about 166 people and since 1996 has had annual gross sales averaging about $18 million. From 1986 to 1996, Jones was a wholly owned subsidiary of Watts. In a September 1996 transaction, Mueller acquired from Watts the stock of three Watts subsidiaries, including Jones. In 1999, Tyco sold the common stock of Mueller Holdings Corporation so that Mueller and Jones were not thereafter related to Tyco. Before, during and after the acquisition, Jones's board of directors transacted business by unanimous consent in lieu of meetings (Corp. Code, § 307, subd. (b)).

During the period when Mueller was Jones's parent, Mueller treated Jones as a typical subsidiary and did not exert extensive control over Jones's management, operations, or finances for the purpose of obtaining an unfair advantage for itself, and Jones was reported as a separate entity by Dun & Bradstreet. Jones's funds were not commingled with the other entities and were the subject of separate accounting. Jones was adequately and independently capitalized, was not dependent on Mueller for financing, and did not

---

[3] The case was before us again in 2002, that time on a discovery issue. (*Armenta v. Superior Court* (2002) 101 Cal.App.4th 525 [124 Cal.Rptr.2d 273].)

require Mueller's guaranty to obtain loans. No one from Mueller was assigned or hired to manage Jones. Mueller never represented to Jones's vendors or customers that it would stand behind Jones's debts.

Mueller did not make any of the representations or claims at issue in this litigation, and Armenta testified at her deposition that she never disclosed to anyone at Mueller her concerns about the parts manufactured by Jones or about "fraud going on" at Jones.

Tyco separately moved for summary judgment on similar grounds, the distinction being that Tyco never had any direct ownership interest in Jones and was only its corporate great-grandparent, a position it assumed in 1996 when Mueller Co., Tyco's indirect subsidiary, acquired the stock of Jones. In its separate statement and supporting evidence, Tyco established the same facts summarized above.

### D.

Armenta, the City of Burbank, the City of Pomona, and the Alameda County Water District opposed the motions, contending among other things that Mueller and Tyco are the "beneficiaries" of Jones's false claims. (§ 12651, subd. (a)(8).) Although the trial court rejected this argument, the majority opinion buys into it because some of Jones's officers were also officers of Tyco, Mueller, or other Tyco subsidiaries. In my view, the majority opinion is wrong.

The majority ignores the rule that the only basis on which the parent and grandparent could be liable for the subsidiary's wrongdoing is under an alter ego theory based on evidence that would permit Armenta to pierce the corporate veil. (*U.S. ex rel. Piacentile v. Wolk* (E.D.Pa. 1995) 1995 WL 20833 at *4.)

The majority ignores the rule that alter ego liability can never be based on the mere fact of the parent-subsidiary relationship (*United States v. Bestfoods* (1998) 524 U.S. 51, 61–62 [141 L.Ed.2d 43, 118 S.Ct. 1876]), or on the mere existence of common directors and officers. Indeed, it "is well recognized that '[t]he law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities'—i.e., parent and subsidiary corporations." (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2006) ¶ 2:52.7, quoting *Cascade Energy and Metals Corp. v. Banks* (10th Cir.

1990) 896 F.2d 1557, 1576.) And, of course, that is all there is, notwithstanding the majority's suggestion that there is more.[4]

The majority ignores the rule that alter ego liability will be imposed on a parent corporation only if (1) there is such a unity of interest and ownership between the parent and subsidiary that their separate personalities no longer exist, and (2) an inequitable result would otherwise occur. (*Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, 741–742 [80 Cal.Rptr.2d 454]; *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1285 [31 Cal.Rptr.2d 433]; *M/V American Queen v. San Diego Marine Const.* (9th Cir. 1983) 708 F.2d 1483, 1489–1490.) In other words, there must be some " 'specific manipulative conduct' by the parent toward the subsidiary which 'relegate[s] the latter to the status of merely an instrumentality, agency, conduit or adjunct of the former . . . .' " (*Laird v. Capital Cities/ABC, Inc., supra,* 68 Cal.App.4th at p. 742; see also *Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th at p. 1285.)

### E.

Then, of course, there is the majority's whimsical interpretation of "beneficiary" as that word is used in subdivision (a)(8) of section 12651.

For Mueller or Tyco to be liable under subdivision (a)(8) of section 12651, there would have to be evidence that they are the "beneficiar[ies] of an *inadvertent* submission of a false claim to the [government entities]," that they "subsequently discover[ed] the falsity of the claim, and fail[ed] to disclose the false claim to the [government entities] within a reasonable time after discovery of the false claim." (Italics added.) In other words, there would have to be evidence that Mueller and Tyco (not Jones) inadvertently *submitted* a false claim, later *discovered* their mistake, and failed to inform their victims. There is no such evidence.

On the issue of knowledge, the majority's simplistic formula—that a triable issue of fact exists because "the right hand (Mueller and Tyco) knew what the left hand (Jones) was doing" (maj. opn., *ante,* at p. 647)—is based primarily on the majority's mistaken belief that dual directorships in and of themselves translate to imputed knowledge.[5] That simply isn't true—and the

---

[4] It is true that Mueller performed its own sample testing shortly after it became Jones's parent in 1996. (Maj. opn., *ante,* at p. 646.) In one test, four ball valves manufactured by Jones were below the 85 metal standard. So what? How can that isolated factoid create a triable issue of material fact about whether Mueller knew a company it had just acquired was involved in the sort of fraudulent scheme alleged by Armenta. Of course, none of this evidence has anything at all to do with what Tyco knew or didn't know.

[5] Subdivision (a)(8) of section 12651 applies only to inadvertently submitted false claims. In her first cause of action, Armenta alleges that all of the defendants knowingly presented false

fact that Jones's directors were also directors of Mueller and half of them were also directors of Tyco cannot by itself support an inference of imputed knowledge. (*United States v. Bestfoods, supra,* 524 U.S. at pp. 61–62 [alter ego liability can never be based on the mere fact of the parent-subsidiary relationship].)

Of course, there is also the fact that, by its plain language, subdivision (a)(8) of section 12651 does not apply to third persons who do not themselves submit claims. To the contrary, it applies to a person who *inadvertently* submits a false claim to a government entity, receives a benefit (hence the use of the word "beneficiary"), then discovers the falsity of the claim and fails to disclose it. The only difference between the California and federal acts is that, for liability to attach under the federal act, the person submitting the claim must know at the time of submission that the claim is false (*U.S. ex rel. Grynberg v. Ernst & Young LLP* (D.Wyo. 2004) 323 F.Supp.2d 1152, 1155; *U.S. ex rel. Piacentile v. Wolk, supra,* at *4; *U.S. v. President and Fellows of Harvard College* (D.Mass. 2004) 323 F.Supp.2d 151; *U.S. v. Safe Environment Corp.* (N.D.Ill. 2002) 2002 WL 976033; Boese, Civil False Claims and Qui Tam Actions 2d ed. & 2005-1 Supp. § 2.01[A][2], p. 2-12, [mere inaction does not constitute a violation of the False Claims Act, and the government must prove more than that a defendant was aware of an alleged fraud]), whereas liability can attach under the California False Claims Act if the submission is inadvertently false *and* the beneficiary later learns of the falsity *and* fails to report it to the victim. (§ 12651, subd. (a)(8); Sen. Com. on Judiciary, Rep. on Assem. Bill No. 1441 (1987–1988 Reg. Sess.) as amended July 14, 1987.)

Because neither Mueller nor Tyco submitted a false claim (or caused one to be submitted) (*United States v. Bornstein* (1976) 423 U.S. 303, 311 [46 L.Ed.2d 514, 96 S.Ct. 523] [the False Claims Act imposes liability only for the commission of acts which caused false claims to be submitted]; *U.S. ex rel. Shaver v. Lucas Western Corp.* (8th Cir. 2001) 237 F.3d 932, 933–934), and because subdivision (a)(8) of section 12651 was enacted to apply only to the "negligent claimant," not to a third party (Sen. Com. on Judiciary, Rep. on Assem. Bill No. 1441, (1987–1988 Reg. Sess.) as amended July 14, 1987, p. 5), neither Mueller nor Tyco can be liable under section 12651, subdivision (a)(8).

---

claims. In her second cause of action, Armenta does not say whether defendants acted knowingly or inadvertently but simply alleges that they were all "beneficiaries of the inadvertent submission of false claims" (she doesn't say by whom) and that they are, by reason of their status as beneficiaries, liable to her for treble damages and forfeitures. While she is certainly entitled to plead inconsistent theories of recovery, the summary judgment motions put her to her proof—and I do not believe she raised a triable issue of material fact under either of these theories.

In sum, I dissent because the majority opinion eviscerates corporate law and opens a supersize can of worms by attaching liability to parent, grandparent, and great-grandparent corporations for the acts of their direct and indirect subsidiaries based solely on status—the existence of the relationships.[6]

A petition for a rehearing was denied September 28, 2006, and on September 1, 2006, and September 28, 2006, the opinion was modified to read as printed above. Vogel, J., was of the opinion that the petition should be granted. Respondents' petition for review by the Supreme Court was denied November 29, 2006, S147225. Corrigan, J., did not participate therein.

---

[6] The two bases for the majority's decision to reverse the summary judgment are (1) that there is a "triable issue of material fact as to whether Mueller and Tyco had knowledge that Jones was selling substandard pipes," and (2) "a triable issue of fact as to whether Mueller and Tyco may be held liable under section 12651, subdivision (a)(8), as beneficiaries of Jones's submission of false claims." (Maj. opn., *ante*, at pp. 647, 649.) For this reason, I see no need to discuss the other issues raised in Armenta's briefs.